UNITED STATES, to Use of BALTIMORE BRICK CO. v. JOHN A. JOHNSON & SONS, Inc., et al. (FRIEDMAN, Third-Party Defendant).

Civil Action No. 2364.

District Court, D. Maryland.
March 27, 1945.

Additional Opinions April 13, 1945, and May 2, 1945.

L. Vernon Miller, of Baltimore, Md., for plaintiff.

G. W. S. Musgrave and Joseph L. Carter, both of Baltimore, Md., for defendant and third-party plaintiffs.

R. Samuel Jett, of Baltimore, Md., and Fred J. Rice, of Washington, D. C., for third-party defendant.

WILLIAM C. COLEMAN, District Judge.

This is a suit under the Miller Act § 1, 40 U.S.C.A. § 270a, brought by the manufacturer and supplier of the material, Baltimore Brick Company, against the subcontractor, J. Friedman Company, and the general contractor's surety, in connection with work on a government project involving the construction of certain dormitories and other buildings at Jarboesville, St. Mary's County, Maryland.

For the reasons about to be stated I find that the Brick Company is entitled to recover in this case the amount of its claim, namely, $5,655.20, with interest from the date of suit, namely, October 14, 1944.

There is a written contract in this case by which the parties must be controlled, represented by the letter of the subcontractor to the Brick Company, dated December 27, 1943, and by the letter of implied acceptance of Mr. Brown, President of the Brick Company, dated January 10, 1944, sent to the subcontractor.

The letter first referred to, from the subcontractor, after reciting that the contract contemplated between the parties has been signed and is enclosed, covering the order for the brick, reads as follows:

"Will you please send a letter in quadruplicate to John A. Johnson & Sons, Inc., Pearson, Maryland (the contractor) and one copy to us stating that the brick that you are delivering complies with the following:

" 'Brick shall be new common brick made from clay or shale and comply with A. S. T. M. Specification C–62–41T, Grade MW.' "

The amount and grade of brick had been previously determined, as disclosed by the order form of the Baltimore Brick Company signed by the subcontractor and accepted by the signature of Mr. Brown, of the Baltimore Brick Company. This order called for approximately 1,300,000 brick, either of Grade M common clay, dumped, at $20 per thousand, or Grade H common clay, dumped, at $27 per thousand, with no designation as to any particular quantity

of either; in other words, it was optional with the purchaser as to whether all of one grade was to be supplied, or some of each, and in what proportion.

In the letter of implied acceptance, with the warranty requirement just referred to, as requested in the subcontractor's letter of December 27, 1943, Mr. Brown, President of the Brick Company, under date of January 10th, stated as follows: "This Company certifies that all the Grade 'M' Bricks that have been or will be delivered to you for the construction of the masonry work on the above mentioned project have been and will be in accordance with A. S. T. M. Specification C–62–T–41."

■ In view of the contract between the parties, as evidenced by the writings just analyzed, I find that the Brick Company was not bound by the government contract and related specifications which covered the government project. The Brick Company was not a party to that contract and specifications, and the knowledge that was brought home to the Brick Company with respect to the use of the brick was not in any sense to bind the Brick Company to any of the government requirements or specifications that might be contrary to the separate contract with the subcontractor, whatever the subcontractor's obligation with respect to his main contractor might be, or the obligation of the main contractor to the Government. Therefore, for the purposes of this feature of the case, that is, the obligations of the three parties—and the only three parties now before us—the manufacturer and supplier of the material, the subcontractor and the surety, it is not material whether the brick met the requirements of the government contract or not.

The Brick Company sues for the unpaid purchase price, the brick having been delivered according to order and accepted, but later declared by the subcontractor to be subgrade and not in accordance with the warranty. Therefore, the only question before the Court in the present suit is: has there been a breach of this warranty?

■ Initially, it must be determined upon whom rests the burden of proof that there has been a breach. I find that this burden rests in the present case upon the defendant, the subcontractor, because the Brick Company has made delivery, all the bricks ordered were accepted, and must be paid for, but if the warranty has been breached, then the defendant may not be required to pay, or at least may recover under his counterclaim, against the purchase price as agreed. So we come at once to the question: Has the defendant sustained the burden of proof? I find from the weight of the credible evidence that the defendant has not, for the following reasons.

■ Since the subcontractor asked for a warranty of A. S. T. M. standards, it is obligatory upon him to show that those standards have not been met. The specifications for those standards call for samples to be taken by the purchaser, in the following language: "For purposes of tests, brick that are representative of the commercial product shall be selected by a competent person appointed by the purchaser, the place or places of selection to be designated when the purchase order is placed. The manufacturer or the seller shall furnish specimens for test without charge."

If, as occurred in the present case, the subcontractor saw fit not to insist upon this form of procedure but to take an unverified certificate from the Brick Company, the subcontractor must be held to at least as strict proof as he would be held to if he had followed the specified procedure.

We then come to the question: What would that proof have been? We find that the specification for these warranted standards, impliedly—though it is true not expressly—contemplate taking bricks that have been unweathered in the sense that they have not been weathered under conditions substantially different from those which would have existed had the brick been in place.

There is in evidence the complete analysis made in January by the Bureau of Standards of some twelve samples taken from a pile of bricks which were among those delivered by the Brick Company at the project site. The subcontractor relies upon this analysis, and since it indicates— and the accuracy of it is not controverted—that three of the twelve bricks that were sampled did not meet the compressive strength requirement, in that they were below the allowable individual minimum of 2200 pounds, as required by the A. S. T. M. standards, the subcontractor says that in itself is a clear indication, apart from any-

thing else, that there has been a breach of the warranty. However, these samples were taken from a pile that had been lying out in freezing winter weather for a considerable period of time, with many surfaces exposed that would not have been so exposed after being put in place in the buildings. Furthermore, the testimony is rather vague as to just what part of the pile these samples were taken from. All of them met all of the requirements of the A. S. T. M. test except three which, as has been stated, fell somewhat short of the minimum compressive strength requirement.

We are not willing to say that this analysis sufficiently meets the burden of proof imposed upon the subcontractor in order to satisfy the charge of breach of warranty. It is true, of course, that it may be said that if the subcontractor should have resorted to the form of procedure when the bricks were first delivered and made certain of the quality of the bricks, by the same token, the Brick Company should have insured itself against a claim of the present sort by giving definite proof that this particular lot of bricks had been tested in order to see whether it met the required standards. But as respects the present claim, the burden of obtaining the analysis rested upon the purchaser. He should not have rested content without it. He waited for the Government to act, and the Government in its turn was negligent. The Brick Company did not deceive the subcontractor.

It is further true that the only analysis put in by the Brick Company related to samples taken from its own plant and tested just a few days ago; also that while those samples, tested by a local, well-known firm of chemical engineers and analysts of high repute, indicate that all of the requirements of the A. S. T. M. standard have been met, it may be said that there is no absolute certainty in the evidence that these samples were identical with the brick that were actually delivered. On the other hand, the proof is uncontradicted that for years this company, well established in Baltimore in the manufacture of brick, with a wide distribution of its products, had been carrying on a standard form of brick manufacture at both of the plants from which the bricks here involved were taken, and that its samples were taken from the kiln, from the same general lot or lots from which the bricks were de-

livered to the present subcontractor, so there is a lack of any convincing proof that we should not treat them as being of the same character and condition. These samples, analyzed for the Brick Company, were taken under conditions which we believe are the conditions which are impliedly called for by the specifications, whereas the samples taken and analyzed on behalf of the subcontractor were taken under conditions which, from the testimony in the case, may have altered very materially the condition of the brick, i. e., put them in a state of absorption with vastly more water content and, therefore, changed their compressive strength very much more than we are prepared to say would have been true had samples been taken and tested at or about the time the bricks were delivered.

It is for these reasons that the Court feels that the subcontractor has failed to sustain the burden of proof that rests upon him in alleging a breach of warranty in a suit of this kind.

Finally, the Court cannot blink the fact, urged upon it by counsel for the Brick Company, that what probably occurred in the present case is that the subcontractor allowed himself to be more rigidly bound by the agreement with his contractor than the subcontractor saw fit to bind on his part the one from whom it bought this material, namely, the brick manufacturer. At long last, that is a practical aspect of the case which this Court can not overlook. What may be the precise legal relationship and obligation between the subcontractor and his contractor and the Government is something yet to be determined, if it is to be litigated, as another part of this proceeding.

Judgment will be signed in accordance with this opinion in favor of the plaintiff against both defendants for the amount stated, with costs against them, and their counterclaims are dismissed.

### Additional Opinion.

This is a suit under the Miller Act § 1, 40 U.S.C.A. § 270a, brought by a subcontractor against the contractor and surety under a Government housing project, carried out by the Federal Public Housing Authority. The subcontractor agreed to do the masonry work on the project, and the only question involved in the present suit revolves around the quality of certain brick that was supplied by the subcontractor under his agreement to do the masonry work.

In other words, the dispute relates to material only and does not involve workmanship, delays in performance or related questions.

As is customary in Government construction work of this kind, two contracts are involved. First, the agreement between the Government agency and the contractor, which is in the customary standard form and into which are integrated, and form a part, elaborate written specifications; and second, the agreement between the contractor and the subcontractor, to which the Government is not a party but which specifically provides, without quoting the exact language, that the subcontractor assumes towards the contractor all of the obligations which the latter assumes towards the Government, and that he will do the work agreed upon in entire accordance with all of the provisions of the contract between the Government and the contractor, including all of the general and special conditions forming or by reference made a part of that contract, and that he shall be bound by it to the contractor and the Government.

We have decided in another part of this same proceeding, namely, in that involving the claim of the manufacturer, the Baltimore Brick Company, of the bricks here in question against the present subcontractor to whom the bricks were supplied, that the manufacturer's claim was a valid one and, accordingly, judgment has been entered in its favor. We rested our decision, as indicated by a separate opinion rendered in that part of the case, upon the finding that the subcontractor had failed to sustain the burden of proof which rested upon him in alleging breach of warranty of the quality of the bricks, that the brick manufacturer had breached this warranty.

Without making detailed reference to that opinion, suffice it to say that, for the purposes of the present controversy, namely, that between the subcontractor found liable in the suit just referred to and his contractor, the bricks known as grade M. W. involved in the earlier suit are the same bricks here involved; and, furthermore, the specifications with respect to the quality of those bricks in the contract between the manufacturer and the subcontractor, involved in the earlier suit, are precisely the same as the specifications now before us, which are part of the contract between the subcontractor and the contractor, by virtue of the fact that these specifications are annexed to and form a part of the main contract between the contractor and the Government, which, as above stated, is expressly integrated into the other contract.

These specifications are as follows: "Bricks shall be new, common brick, made from clay or shale and comply with A. S. T. M. Specification C 62-41 T, Grade M. W." A. S. T. M. is an abbreviation for the American Society for Testing Materials and its specification referred to above sets forth quite elaborate methods of sampling and testing brick of different grades for their qualities, compressive strength, etc. Grade M. W. brick (which in the trade is synonymous with grade M) is defined in the A. S. T. M. specification as "brick intended for use where exposed to temperatures below freezing but unlikely to be permeated with water or where a moderate and somewhat non-uniform degree of resistance to frost action is permissible." As respects sampling and testing of this brick, the A. S. T. M. specifications provide that "for purpose of tests bricks that are representative of the commercial product *shall be selected by a competent person appointed by the purchaser, the place or places of selection to be designated when the purchase order is placed.* The manufacturer or the seller shall furnish specimens for tests without charge." (Italics inserted.)

In the earlier suit, we found, and it was uncontradicted, that neither the subcontractor nor the manufacturer had complied with this provision with respect to the method of sampling, nor had the Government paid any attention to this provision, but was content to rely upon a mere certification by the manufacturer that the bricks did conform to the A. S. T. M. specifications, until long after the work had progressed and a number of bricks were in place, when the project engineer for the Government saw fit to select from piles of brick which had been lying on the project site for a number of weeks, exposed to extreme dampness and also to freezing temperatures, a dozen samples, three of which, when tested by the Bureau of Standards according to the A. S. T. M. specifications, were found to be deficient with respect to the compressive strength requirements. Thereupon, the Government rejected the brick and required that it be replaced, except for interior work, by brick of a better quality. We found, however, entirely apart from whether or not the Government was justified in its position because that question was not before the Court, that the

samples taken, as just explained, on behalf of and tested for the Government, were not truly representative of the brick as actually supplied by the manufacturer, and also not taken in conformity with the A. S. T. M. specifications as to sampling, also just referred to. The manufacturer introduced testimony as to the results of tests made of samples of bricks taken at its plant, from a lot or lots from which the bricks supplied the subcontractor were taken, these samples being removed from the stock piles at the kiln before they had been subjected to weathering which we found was not contemplated either by the trade generally before testing samples, or by the A. S. T. M. specifications just referred to.

Judgment having been given for the reasons just set forth against the subcontractor, he now presses his claim against the contractor, asserting that since he is required by this Court to pay for the bricks according to his contract with the manufacturer, he, the subcontractor, in turn, should have judgment against his contractor and the latter's surety, including any damages which he has suffered by reason of having been required to replace the rejected brick, by brick of a better grade and higher price.

This position of the subcontractor is flatly opposed by the contractor on the ground that the subcontractor has agreed to be bound by all the terms and conditions of the contractor's agreement with the Government; that this agreement makes the Government representative, in this case the project engineer, the arbiter as to whether or not all materials as well as all workmanship have met the specifications; and that since the project engineer ruled that the bricks were of a quality inferior to that called for by the specifications, and ordered them replaced by bricks of a better quality, the subcontractor, just as the contractor, was bound by this decision unless reversed by the Housing Authority on appeal. In support of its contention, counsel for the contractor asserted during the course of the trial that it had presented to the Government, on behalf of the subcontractor, the latter's present claim, but that it has been denied. In short, the contractor's present position may be summed up by saying that it relies basically upon the following provision in Article XIX of its agreement with the subcontractor, to which we shall have occasion again to allude: "Insofar as the work, labor, and material involved in this subcontract are concerned, the second party [the sub-contractor] assumes all the obligations of the first party [the contractor] under the general contract and agrees that all rulings and requirements affecting the same shall be as binding upon the second party as upon the first party."

It must, at the outset, be conceded that the subcontractor's right of recovery against his contractor cannot necessarily be grounded upon the fact that he, the subcontractor, has been forced to pay the manufacturer for the bricks because they were delivered according to specifications, even though those specifications are identical with the specifications agreed upon between the subcontractor and his contractor, since their contract is of a different sort and the general contract between the Government and the contractor is expressly made a part of it, and therefore, the contractual relationship between the subcontractor and his contractor may thereby be rendered materially different from the contractual relationship between the subcontractor and the one who furnished him the bricks. So, we turn to an examination of the pertinent provisions of the two integrated contracts that are now before us for interpretation.

First, it is provided in the contract (Article II) between Johnson, the contractor, and Friedman, the subcontractor that insofar as labor and material are concerned, Friedman shall be required to do all things and be bound by all rulings of the Authority's representative to the same extent as Johnson is bound.

Second, Friedman is required (Article V) within twenty-four hours after receiving written notice from Johnson, to remove from the premises all materials condemned by the Authority or Johnson, whether worked or unworked, and to take down all portions of work which the Authority or Johnson shall condemn as unsound or improper, or in any way failing to conform to the drawings and specifications of the general contract.

Third, Friedman, his foremen and all employees, are required (Article VI) to take their orders directly from Johnson's superintendent, and (Article XIII) Friedman shall not deal directly with representatives of the Authority but shall handle all matters under the contract, the work or the furnishing of materials in connection therewith, exclusively through Johnson unless otherwise directed by him.

Fourth, while there is no provision in the agreement between Johnson and Friedman for the settlement of disputes that may arise thereunder (except a provision (Article IV) for reference to arbitration of any dispute, which we understand to be limited to disputes with respect to additional or extra work in the strict sense, which is different from the dispute here involved), the general contract does provide (Article 15) that "Except as otherwise specifically provided in this Contract, all disputes concerning questions of fact arising under this Contract shall be decided by the Contracting Officer subject to written appeal by the Contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the Contractor shall diligently proceed with the work as directed."

Fifth, while the agreement between Johnson and Friedman contains no provision, independently of the general contract, with respect to inspection of material; and while the specifications forming a part of the general contract say nothing about where brick or materials generally shall be inspected, the general contract does contain precise provisions (Article 6) in regard to inspection as follows: "Article 6. Inspection. (a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all time during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the Contractor shall promptly segregate and remove the rejected material from the premises * * *

"(d) Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity justifies it, unless otherwise stated in the specifications; and such inspection and acceptance, unless otherwise stated in the specifications, shall be final," except as regards matters not here involved. "Subject to the requirements contained in the preceding sentence, the inspection of material and workmanship for final acceptance as a whole or in part shall be made at the site."

Lastly, the general contract provides (Article 5) that "except as otherwise herein provided no charge for any extra work or material will be allowed unless the same has been ordered in writing by the Contracting Officer and the price stated in such order." Complimentary to this provision, the contract between Johnson and Friedman provides (article VIII) that Friedman shall make no claim for additional work unless the same shall be done pursuant to written order from Johnson, and notice of all such claims shall be made to Johnson in writing before the next ensuing payment or shall be considered as abandoned by Friedman. It may be said here, without deferring consideration of these latter provisions, that we do not consider they have any application to the present controversy because they clearly appear to relate to extra work, that is, work not within the express or reasonably implied scope of the specifications agreed upon at the time that the two contracts were made. In short, we take the same position with respect to these provisions that, as above explained, we do with respect to the provision in the agreement between Johnson and Friedman with respect to arbitrable questions. Furthermore, it is at least questionable whether, in any event, such a provision for arbitration would be binding upon the parties so as to oust a court of jurisdiction to determine the ultimate right of either party to enforce the agreement. See Wilson & Co. v. Curlett, 140 Md. 147, 117 A. 6.

From the aforegoing provisions of the two integrated agreements, it will be seen that there are several basic requirements imposed upon (1) the contractor, (2) the subcontractor, and (3) the Government, with respect to (1) the right to inspect and to accept or reject materials before being utilized on the project, and (2) the right to inspect and to accept or reject materials at later stages, i.e., during the progress of the work. These requirements may be summarized, briefly, as follows: As respects the contractor: Insofar as original inspection or testing of the brick is concerned, the contractor both as purchaser from the subcontractor and as seller to the Government, was bound by the provision in the

A. S. T. M. specifications, already quoted, with respect to sampling and testing, namely, that tests shall be made from samples selected by the purchaser at place or places designated by him when the purchase order is placed. As respects inspection of materials after their acceptance and during the progress of the work, the contractor is bound by the action of the Government's plant engineer as respects acceptance or rejection of all materials, subject to the right to appeal to the Federal Public Housing Authority itself within thirty days if dissatisfied with the project engineer's action, but meanwhile, the contractor shall carry out the project engineer's orders.

As respects the subcontractor: In relation to testing of samples of materials before utilized on the project, the subcontractor is bound by the provisions of the A. S. T. M. specifications just referred to in analyzing the corresponding position of the contractor. As respects any question of rejection of material during the progress of the work, the subcontractor shall deal directly with, and take all orders from the contractor, and not the plant engineer, unless otherwise directed by the contractor; and there is no provision for making a claim, such as the one involved in the present suit, by the subcontractor himself except as he is represented by the contractor in dealing with disputed matters which affect the subcontractor and with respect to, which the project engineer's decision is final, subject only to the right of the contractor to appeal within thirty days, if dissatisfied with such decision, to the Housing Authority itself.

As respects the Government: The right is given to inspect material at any time and at any place where the material is manufactured or being used on the project, except that inspection of material and finished articles to be incorporated in the work at the site,—and the brick here in question clearly falls within this category, —must be made at the place of production, manufacture or shipment whenever the quantity justifies it,—as it did in the present case,—unless otherwise stated in the specifications,—and the specifications, while saying nothing as to where brick or materials generally shall be inspected, the A.S.T.M. specification C 62–41T, Grade M.W., contains the provision, already referred to, that tests for determining whether this specification has been met shall be made from samples selected by the purchaser,—in the present case, the contractor, —at place or places to be designated by the purchaser when the order is placed.

Thus, it follows from the aforegoing that the respective parties were obligated as follows, insofar as the brick here in issue was involved: (1) The contractor was obligated to select his own samples when he ordered the brick from the subcontractor, and to test them, and if he failed to take advantage of this right given him under the specifications, he assumed the risk of not being able, at a later date, to substantiate a claim that the bricks were subgrade when purchased; (2) the subcontractor had the right to assume that the contractor would either insist upon the method of sampling for tests given him by the specifications, or if he saw fit not to do so, would run the risk incident thereto; and (3) the Government, as respects sampling, was placed under the same obligation in its relation with the contractor that the latter was in his relations with the subcontractor,—even though the Government may not really have been a purchaser of the bricks in the same sense,—and if the Government did not see fit to do its part under the specifications, it assumed the resultant risk.

Having thus analyzed the legal rights and obligations of the respective parties under the two integrated contracts, insofar as the question of whether the bricks measured up to the specifications of the contracts is concerned, we turn to a consideration of the facts as disclosed by the evidence.

We find the following facts to be either undisputed or established by the weight of the credible evidence:

December 2, 1943, that is, after the date of both contracts but before the masonry work on the project had been commenced, Johnson, the contractor, submitted to Powell, the project engineer representing the Housing Authority, some samples of brick which Johnson acquired from the Baltimore Brick Company. The project engineer replied on December 8th, stating that "The same are hereby approved to be according to plans and specifications," but asked for "manufacturer's certificate of compliance with Federal Specifications as soon as possible." On January 12, 1944, the contractor sent the project engineer

some further samples from the Brick Company, together with a certification, signed by the President of the Brick Company, to the effect that the bricks met the specifications, but no analysis or proof of tests were sent and, in fact, none had been made up to that time in compliance with the A.S.T.M. specifications. This letter was never answered, but on the same date the project engineer wrote Johnson that the bricks were deteriorating where they had been piled on the project site, due to frost; referred to the fact that no certification had yet been received that the bricks met the specification requirements, and advised the contractor that if he proceeded to use these bricks on the project, he did so at his own risk. A copy of this letter was sent to the subcontractor. On January 22nd, the project engineer wrote the contractor that the bricks were condemned because, although originally approved by his office, "a recent report by the Bureau of Standards indicates that 25% of these bricks did not meet the crushing strength test." Two days later the contractor informed the subcontractor of the project engineer's action; stated that liability for any additional expense due to replacement of the bricks was the subcontractor's, and that he should take immediate steps to supply bricks meeting the specification requirements. On January 26th, the project engineer wrote to the contractor confirming a verbal understanding that the condemned bricks might still be used for interior, but not for exterior, construction.

Following the aforegoing correspondence, the contractor made repeated requests of the project engineer for a copy of the Bureau of Standards' analysis of the bricks, but this was never received by the contractor until the following June, although the tests had been made on January 25th. The contractor then sent a copy of the analysis to the subcontractor. On September 14th, the subcontractor made a formal, written claim against the contractor for the sum of $8742.50. With this letter, the subcontractor sent a copy of a letter dated August 1st which the subcontractor had received from the Brick Company, protesting the adequacy of the tests upon which the project engineer relied, and explaining that it, the Brick Company, intended to enforce collection from the subcontractor for the rejected brick. In this letter of September 14th, the subcontractor stated that: "In order to protect ourselves, inasmuch as we are in the middle and innocent in any event, whether the government be right or wrong, we are obliged to and hereby make full claim against you for $8742.50 in accordance with statement enclosed. It is our suggestion that to protect yourself against the same eventuality, you make claim against the United States Government so that when this matter is finally determined, the responsibility will then lay with the United States for improperly rejecting the brick or with the Baltimore Brick Company for furnishing improper brick." To this the contractor replied under date of September 18th, denying liability, and made the rather extraordinary statement that he was still "attempting to obtain copies of the A.S.T.M. Standard Method of Sampling and Testing Brick C 64–41 and A.S.T.M. Specification for building brick, C 62–41 T, referred to in the Bureau of Standards' report," and asked the subcontractor for a copy of same, explaining that the copy which had been sent to the subcontractor in June "was furnished unofficially by the Area Engineer in the Regional Office on June 14th, well after the completion of the Baltimore Brick Company's last delivery." To the contractor's letter of September 18th, the subcontractor replied, under date of September 25th, stating that the requested copy of the A.S.T.M. specifications was not available; denying that the Government's action was binding upon him, the subcontractor, unless so determined as a result of court decision.

Finally, following this correspondence, the contractor did present the subcontractor's claim to the Government in accordance with Article 15 of the general contract but it was rejected. The thirty days period following such rejection within which the contractor may appeal to the Housing Authority has not yet expired. The contractor has agreed to take the appeal in due course, and has asked the assistance of the subcontractor in prosecuting it, but the latter asserts that he is neither to be bound by the result of that appeal, nor required to await until it is announced before prosecuting his claim in the present suit.

In view of the facts as disclosed by the correspondence between the parties which we have just analyzed and by the verbal testimony adduced at the trial, we conclude

524

that the position taken by the subcontractor is sound both as respects his right to prosecute his claim in the present suit and his right to recover thereon, for the following reasons.

[5] There are two basic questions involved upon which the contractor's liability hinges: First, did the bricks measure up to the contract specifications when furnished at the site by the subcontractor; and (2) regardless of whether they did or did not meet the specifications at such time, was the contractor, nevertheless, barred by his conduct from refusing to pay for them in accordance with the contract price?

As to the first of these questions, we must answer it in the affirmative because, although our ruling in considering the claim of the brick manufacturer against the subcontractor that the bricks were of satisfactory quality when delivered at the project site is not res adjudicata as respects the contractor, because by stipulation he did not participate in the hearing on that question, the evidence there adduced, which has been stipulated into this part of the case, is substantially the only evidence with respect to the quality of the bricks and we see no reason to change our ruling thereon. Nor does it seem necessary to do much more than to refer at this time to our opinion in the other part of the case for our reasons for deciding that the bricks measured up to the required specifications.

■■ The obligation upon the contractor, insofar as taking samples for tests was concerned, was identical with that of the subcontractor in the latter's contract with the manufacturer because he was committed to the requirements of the same specifications, among which, as we have seen, was that the purchaser,—as between the subcontractor and the contractor, the latter stood in the position of purchaser,—shall select, for the specified analysis, the samples at the time of purchase. This, the contractor did not do. The subcontractor had a right, therefore, to treat this failure and subsequent use of the bricks as a waiver of this initial requirement. He did not interfere with, or mislead the contractor with respect to samples or analysis. What really happened was what doubtless often occurs in building transactions, i. e., the contractor did not trouble to determine whether the bricks really met the specifications but left this to the owner (the Government) since it was the latter that he had

to satisfy; and the latter, in turn, rested content to accept something less than proof that the bricks did actually meet the required specifications until trouble with them arose. However, while the requirement as to sampling was in the nature of a privilege in the contractor's favor, he could not disregard it if such disregard be used to the detriment of the subcontractor, without fault or waiver on the latter's part, for such would be tantamount to a breach of the contract.

■ We have already found that the bricks did measure up to the required specifications when delivered at the project site. We have found that the subcontractor in contracting with the manufacturer, just as the contractor in dealing with the Government, failed to carry out the provision of the specifications with respect to sampling at the time of purchase and delivery and, therefore, we had to rely upon samples which, although taken much later, were taken from the same lot or lots and had not been subjected to extreme variations in temperature as had been the bricks which were delivered at the project site before being utilized in construction. Therefore, we are forced to conclude that, just as the subcontractor failed to prove any breach of warranty on the part of the manufacturer, the contractor has made a similar failure as respects the subcontractor and that, therefore, he, the contractor, has no ground for saying that he was not obligated to accept the bricks.

■ Coming to the second question above stated, which goes to the right of inspection and rejection *after* acceptance, it is true that by virtue of Article V of his contract with the contractor, the subcontractor was compelled to accept and to comply with the plant engineer's rulings in the first instance. However, such rulings were not ultimately binding as between the subcontractor and the contractor, if the subcontractor can show that either the contractor or the plant engineer has failed to comply with his own contractual obligations.

■ Applying this latter principle to the facts, we conclude that there was a failure of compliance on the part of both the contractor and the plant engineer for the following reasons: As we have seen, the tests upon which both of them relied were from samples which were taken too late, and had been subjected to severe

weathering not contemplated by the specifications; and, therefore, the contractor is not to be released from liability to the subcontractor merely, as is contended on behalf of the contractor, because of the fact that the Government had the right to accept or reject material at any time in the discretion of the project engineer.

In short, mutuality of performance is the basis of the tri-party contractual obligations with which we are here concerned. The contractor had no more right to breach the contract than did the subcontractor. Similarly, the plant engineer was required to fulfill his obligations as set forth in the main contract. If there has been a breach in the plant engineer's performance, the contractor may not successfully excuse his resultant own non-performance, any more than he may excuse a breach that he, himself, alone has committed. This is a question quite distinct from mere questions of fact relating to the prosecution of the work, regarding which discretion is vested in the plant engineer. Even though such questions be erroneously determined by the plant engineer, it is true that the only avenue for relief given to both the contractor and the subcontractor by the express provisions of Article 15 of the general contract is appeal to the Housing Authority whose decision shall be final. In the absence of fraud or mistake implying bad faith or lack of honest judgment, decisions of the project engineer with respect to questions of fact entrusted to his discretion, are not subject to revisory power of the courts. See United States v. Madsen Construction Co., 6 Cir., 139 F.2d 613; J. A. LaPorte v. Mayor & City Council, D.C., 13 F.Supp. 795 and cases cited.

The distinction between the two questions is real, not fanciful. For example, delays incident to permitted changes in original specifications do not amount to a breach of a contract of this sort. It is a matter for equitable adjustment by the Government by express provision of the general contract relating to changes (Article 3). United States v. Callahan, Walker Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49; United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53. Had the project engineer on his part, fulfilled the requirements of the specifications as to testing the brick, and even though such tests showed the brick to be up to the required specifications, if, after they had been put in place, the project engineer saw fit to reject them and to require a better grade, provided such rejection was not fraudulent or lacking in honest judgment, his discretion would control because this would be a question of fact within the discretion of the project engineer and his decision is made final, as we have seen, in such cases, subject only to an appeal to the Housing Authority, with claim for additional work. But in the present case we have a breach of performance on the part of the project engineer in advance of that stage in performance under the contract which leaves matters to the discretion of the project engineer. Therefore, while the question of the liability of the Government to the contractor is not now before us, and whatever may be the Government's defense to the breach of performance on the part of the project engineer, we find, for the purposes of the present suit, that such breach did occur and that the contractor cannot successfully avoid liability to the subcontractor in the face of this breach, any more than he can avoid liability because of his own similar breach.

There is one further point which has considerable bearing upon the conduct of the Government in this case. The Government and the contractor who had to conform to Government specifications, did not call for more than one grade of brick, namely, grade M.W. However, the subcontractor in contracting with the Brick Company for supplying the brick, had an agreement whereby it could demand delivery, up to the specified amount of brick, either of this grade or of a better grade H, with no designation as to particular quantity of either. This alternate arrangement was made because both the Brick Company and the subcontractor were satisfied from their experience that grade M. W. was not suitable for exterior work in this latitude. We cannot blink what appears to be the very natural inference from all the circumstances in this case, namely, that the Government made an error in specifying the inferior grade of brick for the exterior work, and upon recognizing its error, which it did not do until the masonry work was well advanced, it then attempted to cover up its error by relying upon its right to reject any and all material under the contract. While there is no direct allegation of bad faith on the part of the project engineer, we feel that there is ample proof in the case that his negli-

gence in performance under the general contract ran not merely to his failure to determine at the outset the true quality of the bricks which were being supplied, but as well to his unwillingness to recognize that the specifications were in error and that a change in the quality of the brick for exterior work was called for. These considerations, of course, add support to the conclusion which we here reach that it would be inequitable and contrary to a proper construction of the contracts to deny relief to the subcontractor.

Finally, no part of the subcontractor's claim in the total amount for both extra material and labor having been shown to be improperly computed, the subcontractor is entitled to a judgment for the total amount, namely, $8,555.40, against the contractor and surety, with interest from the date the sub-contractor filed his counterclaim herein as a third party defendant, namely, December 28th, 1944.

Additional Opinion on Motions to Dismiss
Defendants' Motions to Dismiss the Second and Third Separate and Affirmative Counterclaims.

The questions now before us arise out of a suit under the Miller Act, § 1, 40 U.S.C.A. § 270a, brought originally by the Baltimore Brick Company, a supplier of materials, against the general contractor and its surety under a Government housing project, carried out by the Federal Public Housing Authority, in St. Mary's County, Maryland.

As a result of separate hearings in this same proceeding, this Court has rendered separate opinions respecting claims, not here involved, between the several parties. A subcontractor, third party defendant, Jacob Friedman, a citizen of the State of New York, doing business as J. Friedman & Company, has brought two counterclaims, among others, against the general contractor, John A. Johnson Sons, Inc., a New York corporation, and its surety, the American Surety Company of New York. These two counterclaims are the subject of the present proceeding.

The substance of the first of these two counterclaims is that, in the progress of the work on the project, the subcontractor was required to do extra work costing $124.61 in rebuilding a certain garage wall which had been damaged by another subcontractor.

The substance of the second counterclaim is that the general contractor, although hav-ing expressly agreed to provide temporary construction of every nature, necessary to the completion of the work on the project by the subcontractor within the specified time, including the providing of access to the construction site, the general contractor nevertheless failed to provide such access and that, as a result, the progress of the work by the subcontractor was materially interfered with and delayed, thus greatly increasing the cost to the subcontractor, whereby he was damaged in the sum of $13,740.01.

With respect to each of these counterclaims, the general contractor and its surety have filed a motion to dismiss. The basis of such motion with respect to the first mentioned counterclaim is that, under the provisions of Article VII of the formal written contract between the general contractor and the subcontractor, the former is relieved of any liability for such loss as that alleged to have been suffered by the subcontractor. The basis of the motion to dismiss the second mentioned counterclaim is that there is no relationship between this counterclaim and the original action with respect to which this Court assumed jurisdiction; that this counterclaim asserts an independent action for damages which cannot be entertained by this Court in this proceeding; and that there is a lack of diversity of citizenship, requisite to assumption of jurisdiction by this Court, between the general contractor and the subcontractor, they both being inhabitants and citizens of the State of New York.

With respect to the first of these counterclaims, the provisions of Article VII of the subcontract are controlling. We cannot annul or ignore those provisions, which are as follows: "The party of the second part [the subcontractor] shall not cause any unnecessary hindrance or delay to other contractors on said building, and shall bear all damages done to the work of such other contractors by him (them) or his (their) employees, * * *, and shall be directly responsible to any other contractor or subcontractor whose work is so damaged, and in the event the work of the second party is damaged by any other subcontractor or contractor on the site, such other contractor and subcontractor shall be directly responsible to the second party and the second party will not seek compensation or damages from the first party [the general contractor] by reason thereof."

These provisions are completely free from ambiguity. They are not in con-

flict with any other provision in the same agreement, or in the main contract whose provisions are expressly made a part of it. Therefore, they must control. It necessarily follows, then, that the subcontractor has no standing in this proceeding to assert a right to recover under this counterclaim for the damage in question.

Coming, then, to the motion to dismiss the other counterclaim of the subcontractor Friedman, the basic question here is whether under the Miller Act a subcontractor may recover damages against a general contractor and his surety on a claim which is directly predicated on a breach of contract by the general contractor and not on the furnishing of labor and material by a subcontractor pursuant to contract.

That this is a suit by the subcontractor for such breach of contract by the general contractor seems clear. Article II of the subcontract expressly exempts the subcontractor from providing, at his own expense, temporary roads to the construction site, although he is required to provide "other means of access." But that phrase is meaningless, because it is admitted that no other means were feasible. "Temporary roads" were expressly included in the form of Article II of this agreement as originally drawn, but were erased when the contract was executed. Thus we must proceed upon the theory, which is conceded by both parties, that an obligation existed upon the general contractor to construct and pay for all temporary roads necessary to the proper performance of the subcontractor's work.

The subcontractor asserts that the basis of the counterclaim is extra or additional work and labor, relying upon Article VIII of the subcontract, which provides the conditions under which claims shall be made by the subcontractor for additional work, and the subcontractor asserts that, upon trial on the merits of this counterclaim, compliance with those requirements and performance of the additional work and labor can be proved.

■ Article VIII provides: "The party of the second part shall make no claim for additional work unless the same shall be done in pursuance of written order from the party of the first part, and notice of all such claims shall be made to the party of the first part in writing before the next ensuing payment, or shall be considered as abandoned by the party of the second part." However, we do not think that this provision is intended to include, as "additional work," money expended in material and wages because of the general contractor's failure to construct temporary roads which he, by the express terms of the contract, was required to do. We feel that this provision, in employing the words "additional work," intends to refer to what would normally be treated as additional or extra work, as, for example, an enlargement or other change in some of the specifications thereby increasing the cost, and not to something which is already expressly covered by an obligation imposed upon one or the other party.

It is asserted on behalf of the general contractor that what the subcontractor could and should have done, when proper access was not afforded him, was to have refused to go on with the work until such was afforded. There is merit in this contention. We do not think he was obligated to go on. The last paragraph of Article IV of the subcontract does not cover this kind of a situation. It reads as follows: "Where work is required to be done, and the parties can not agree as to whether such work is extra work or as to valuation by reason of any modification as herein provided, the performance of same shall not be delayed, but the second party shall nevertheless proceed with the work upon the written order of the first party." This, we believe, is not to be construed as covering something which is already expressly covered by another provision in the contract; and even if it could be proved that what the subcontractor did was upon the written order of the general contractor, we still would have the substantive question to determine, namely, whether any right arises for which recovery may be had under the bond, because we are here dealing with rights granted by statute which, if they may be exercised at all, exist against both the contractor and the surety.

■ It may well be that the subcontractor has a meritorious claim against the general contractor, in a separate suit in a State court (not in a Federal Court because diversity of citizenship is lacking), but the question here is: can this claim be prosecuted in this particular statutory proceeding? Under the statute, the general contractor is required to give two bonds: One a performance bond for the protection of the Government; the other

a payment bond for the protection of persons furnishing labor and materials. It is the latter with which we are here concerned. Its obligation is to "promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract that may hereafter be made, * * *." Thus, it is clear that the obligation by which the general contractor and surety are bound to subcontractors excludes payment for everything except labor and material actually called for by the contract between the general contractor and the Government, which is made a part of the contract between the general contractor and the subcontractor.

We have been referred to no proceeding, either under the Miller Act or the Heard Act, 40 U.S.C.A. § 270, of which it is an amendment, where jurisdiction over a claim such as the present one has been exercised.

The general contractor relies largely upon the case of L. P. Friestedt & Co. v. United States Fireproofing Company, 125 F.2d 1010, a recent decision of the Circuit Court of Appeals for the Tenth Circuit. There it was held that the general contractor's surety was not liable to subcontractors for losses sustained because of breach of contract by the general contractor in causing delays which prevented completion of the work within the time contemplated, since the subcontractor did not furnish any extras for completion of the work, and since the claim for these alleged losses arose outside of and not under the contract. The Court said (pages 1011, 1012 of 125 F.2d):

"Stripped of all technicality, plaintiff and intervenor seek to recover damages claimed to have been incurred because of the breach by the contractor of an implied covenant in the sub-contract against unreasonable delays preventing the subcontractors from proceeding with their work. * * *

"The bond on which the action is based is not set out in the abstract, but we may assume that it is in due form and conforms to the requirements of the Act. The Act obligates the surety company to see that the contractor 'shall promptly make payments to all persons supplying him or them with labor and materials in the prosecution of the work provided for in such contract.' It requires payment not only of work and materials specifically mentioned in the contract, but also those items which the parties necessarily and reasonably contemplated as being required for the performance of the contract. It has been held that where the work was so remotely located that the contractor had to board his employees, groceries furnished the contractor and consumed by his workers were within the contemplation of the parties as materials necessarily furnished under the contract. Brogan v. National Surety Co., 246 U.S. 257, 38 S.Ct. 250, 62 L.Ed. 703, L.R.A.1918D, 776. In Title Guaranty & Trust Co. v. Crane Co., 219 U.S. 24, 31 S. Ct. 140, 55 L.Ed 72, recovery was allowed not only for cartage and towage of materials, but also for drawings and patterns used by the contractor in making molds for casings which entered into the construction of the ship. In United States Fidelity & Guaranty Co. v. United States, for benefit of Bartlett, 231 U.S. 237, 34 S.Ct. 88, 58 L.Ed. 200, where the work contracted for was building a breakwater, recovery was allowed for all labor at a quarry operated fifty miles away. This included the labor not only of the men who stripped the earth to get at the stone and who removed the debris, but carpenters and blacksmiths who repaired the cars in which the stones were carried to the quarry dock for shipment, and to repair the tracks upon which the cars moved. The claims allowed also included the wages of stablemen who fed and drove the horses which moved the cars on these tracks. In Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206, recovery was allowed not only for the rental of cars, track and other equipment used by the contractors in facilitating the work, but also the expense of loading this equipment and freight in order to transport it to the place where it was used. In each of these cases the Act was liberally construed to protect those furnishing labor and material that went into the construction covered by the contract. It is to be noted, however, that in every instance recovery was allowed on the bond because the outlays for which recovery was sought were necessary for the performance of the contract and were within the contemplation of the parties to the contract.

"Here the contract required plaintiff and intervenor to furnish labor and material and perfect certain construction. They performed their part of the agreement and

received their agreed compensation provided for in the contract. There is here no claim that they furnished any extras necessary for the completion of the contract and therefore contemplated by the parties and implied in the contract. The claim for which the parties seek recovery here did not arise under the contract, but outside of the contract. What was done was not required by any of the terms of the contract but became necessary because of an alleged breach of the contract because a contractor violated one of the terms of the contract; in other words, committed a wrong against the parties resulting in loss or damage to them.

"We know of no case that has gone so far as to hold that one may recover damages for breach of a contract on a bond required under the Heard Act. The only case deciding this precise question has held to the contrary. See United States v. Seaboard Surety Co., D.C.Mont., 26 F.Supp. 681. We fail to discern anything in the Heard Act evidencing a Congressional intent to protect one under the bond required by the Act against damages resulting from breach of contract. Had such been the Congressional intent, it no doubt would have been evidenced by appropriate language."

In United States v. Seaboard Surety Co., D.C., 26 F.Supp. 681, cited in the opinion in the Friestedt & Co. case, it was held that a subcontractor could not recover from the surety on a federal building contractor's bond for loss suffered because of delays growing out of acts or omissions of other subcontractors. The Court said (page 688 of 26 F.Supp.):

"It is said in United States to Use of Hill v. American Surety Company, 200 U.S. 197, 203, 26 S.Ct. 168, 170, 50 L.Ed. 437: 'The purpose of the law is, as its title declares: "For the protection of persons furnishing materials and labor for the construction of public works;"' which evidently does not include a guarantee of profits which a contractor or subcontractor may expect to make, or a promise to make good any loss that either of them may suffer. If such had been the Congressional intent it would have been easy to express it in plain words. This was not done; and, on the other hand Congress limited the right to bring suit on the bond in the name of the United States to 'the person or persons supplying the contractor with labor or materials' and to them only upon 'furnishing affidavit to the department under the direction of which said work has been prosecuted that labor and materials for the prosecution of such work has been supplied by him or them, and payment for which has not been made.' The bond involved in this case appears to be conditioned as provided in this statute and it must be read in the light of the true intent and purpose of the act. Sample v. Murray Hospital, 103 Mont. 195, 201, 62 P.2d 241, 247.

"To hold that Watsabaugh & Company have a right to recover from the defendant Seaboard Surety Company for the loss, if any, suffered by them because of delays growing out of the acts or omissions of others would be to add to the terms of the agreement. This the law does not permit. In the construction of an instrument the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted."

To the same effect is United States v. Maryland Casualty Company, 54 F.Supp. 290, 298, a decision of the District Court, Western District of Louisiana, decided largely upon authority of the Friestedt Co. case. There the Court said: "We are unable to distinguish in principle the present from the Friestedt case. While the plaintiff calls its demand one for the rental or the use value of its equipment, it is in reality for the damage caused by keeping the equipment idle in compliance with the orders of the Government engineer—in other words, for a breach of the implied obligation that it would be permitted to perform without interference. It is not a claim for money paid to others for the rental of the machinery, as was true in some of the cases cited, but for what it lost, because of its inability to use or remove the equipment. Whether or not, in an appropriate action for what was paid to the owners of the machinery as rental, it could recover, is not a matter which can be decided in the present state of this case."

On the other hand, the subcontractor claims that there is definite support for his position in a very recent decision under the Miller Act, namely, United States v. American Surety Company of New York, 142 F.2d 726, by the Circuit Court of Appeals for the Second Circuit. There, in a subcontractor's suit against the general contractor's surety to recover a balance due

under the subcontract, the counterclaim of the general contractor against the subcontractor was allowed, notwithstanding there was no diversity of citizenship between contractor and subcontractor, on the ground that the counterclaim was based on breach of the same contract on which the subcontractor was suing; in other words, that there had been a guarantee against defective materials and workmanship by the general contractor which agreed to install boilers on a United States vessel, and that this guarantee was part of the specifications that the subcontractor had in turn agreed to. The Court said (pages 728-729 of 142 F.2d):

"The counterclaim it [the contractor, Atlantic Basin Iron Works] filed against the plaintiff was likewise properly allowed although there was no diversity of citizenship to support jurisdiction. It was based on an alleged breach of the same contract on which the plaintiff sued. Although the intervenor could not have sued the plaintiff in the first instance on that contract in a federal court, yet when the plaintiff sued upon it under the Miller Act and the intervenor became a party to that suit no additional ground of jurisdiction was needed to support the counterclaim. Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L. Ed. 750, 45 A.L.R. 1370. Of course the propriety of such orders as these would hardly have been questioned had they been made after the Federal Rules of Civil Procedure took effect. Rules 13(a) and 24(a), F.R.C.P., 28 U.S.C.A. following section 723c. * * *

"The reason why the parties stipulated that the boilers and their equipment were installed 'pursuant' to the contract between Atlantic and the government is found in the Proposal and Specification No. 38599 which was submitted to Atlantic by the plaintiff on November 16, 1936, and on which the subcontract was drawn. The plaintiff then knew that the materials to be installed under its supervision, which it proposed to supply to Atlantic, were for the purpose of enabling Atlantic to perform its contract with the government, and to make it plain that the plaintiff would perform pro tanto in accordance with the terms of that contract its above mentioned proposal and specifications stated that:

"'It is definitely understood and agreed that in any point wherein the foregoing specifications as submitted by Foster Wheeler Corporation differ from the plans and specifications section D E F. 2 only as issued by the Superintendent, Army Transport Service, N.Y.P. of Embarkation for furnishing new boilers, U.S.A.T. "Republic", I.N.V. AT 626-37-30, October 23rd, 1936, that the latter specifications will govern.'

"There was included in what the plaintiff designated as the 'latter specifications' in the above quoted excerpt from its proposal and specifications the following provision for a guarantee:

"'The contractor shall guarantee (in writing) the equipment furnished, against defective materials and workmanship in any part for a period of one (1) year from the date of acceptance and any part proving defective within that time shall be promptly replaced by supply of new part or otherwise remedied by the contractor without cost to the U. S. Government. The contractor shall further guarantee that all information stated by him or his agents on the data sheet to be submitted and the certificate of tests furnished, is correct and reliable, and any failure of the equipment or apparatus furnished and accepted to conform strictly to such statements, after installation and prescribed trial under working conditions, shall be promptly corrected at the expense of the contractor, to the full and complete satisfaction of the Officer in Charge.'

"This guarantee, being a part of the specifications which the plaintiff agreed to have treated as its own in so far as the latter differed in any point, was thus adopted by the plaintiff. The guarantee in the subcontract, which is expressed in somewhat different language, must therefore be construed accordingly."

In this New York case, it is to be noted, there was a reversal of the positions of parties litigant as compared with the present case. That is to say, here, the subcontractor is bringing the counterclaim against the contractor and surety, whereas in that case it was the contractor who sued the subcontractor by counterclaim. However, we think this is immaterial, provided the subject of the suit arises under the contract, or under the provisions of contracts that are reciprocal. We do not find that such is true in the case before us.

To repeat, we think a distinction must be made between doing work which is of an extra or additional character, or reasonably implied by the terms of the contract as part of the obligation of the subcontract-

or, and work which, as in the present case, not he but the main contractor alone is, by the very terms of the agreement, required to do. The distinction is, in a sense, narrow and technical, but it goes to the very essence of the restricted rights given by this special statute, the Miller Act. We are not unaware of the fact that there are numerous decisions to the effect that a liberal construction must be given to the Miller Act and its predecessor, the Heard Act. See Standard Accident Ins. Co. v. United States, 302 U.S. 442, 58 S.Ct. 314, 82 L.Ed. 350; Fleisher Engineering & Const. Co. v. United States, 311 U.S. 15, 61 S.Ct. 81, 85 L.Ed. 12. But the liberality of construction referred to in those decisions is not meant to go so far as to extend the scope of the Act and to embrace a claim for damages such as the present one.

 It must necessarily follow that the Rules of Civil Procedure, and specifically Rule 13(a), (b) and (h), can not be construed to extend the scope of the Miller Act. These Rules provide as follows:

"(a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim, not the subject of a pending action, which at the time of filing the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

"(b) Permissive Counterclaims. A pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim. * * *

"(h) Additional Parties May Be Brought In. When the presence of parties other than those to the original action is required for the granting of complete relief in the determination of a counterclaim or crossclaim, the court shall order them to be brought in as defendants as provided in these rules, if jurisdiction of them can be obtained and their joinder will not deprive the court of jurisdiction of the action."

 It may well be that in an ordinary suit, these Rules would extend the scope of the action to permit the consolidation of all claims. But we are unwilling to say, just because of their broad language, that the present type of claim can be entertained in a Miller Act proceeding.

Finally, it may reasonably be argued from the dearth of authorities on this precise question, that, in line with the Friestedt case, it has been generally conceded that this type of claim was not cognizable under either the Heard Act or the Miller Act. But however that may be, both the weight of such authority as exists, and logical interpretation of the statute, require conclusion here reached.

We are not unmindful of the fact that, in another part of this same proceeding, we have allowed this same subcontractor to recover from the general contractor on a counterclaim for extra material and labor he had furnished, on the ground that there was an improper rejection by the general contractor of the material originally supplied. That is to say, we held that the subcontractor was entitled to be paid what this improper rejection had cost him, due to replacing the material with material of higher grade.

Such counterclaim, it is true, was based upon breach of contract in the sense that the general contractor had not lived up to his part of the agreement in so far as a duty to inspect the material, originally supplied, was imposed upon him in the first instance. However, by the express terms of the last paragraph of Article IV of the subcontract, which we have previously quoted, the subcontractor and not the general contractor was required to replace the material when ordered so to do by the general contractor, without prejudice to the right given him by the subcontract to have a later determination as to whether or not he should have reimbursement for any additional expenditures as a result of such replacement. So, it will be seen that the performance by the subcontractor, upon which he based his right to recovery, was performance such as was expressly required of him by the contract for which, and only for which, he could recover under the payment bond which we have heretofore analyzed; whereas, in the present case, there is the distinction that the subcontractor has not supplied labor and materials which he was, in fact, ever required to supply by the terms of the contract. Thus, the subcontractor's present counterclaim is for damages as such, resulting from the general contractor's alleged breach of the contract, although it is true the alleged damages are measured by the cost of labor and materials to the subcontractor which the general contractor, if any one, should have supplied but did not.

532

The distinction is more than a mere technical one. It is a legal distinction required by the very terms of the documents by which the subcontractor is restricted in this limited, statutory proceeding.

Accordingly, an order will be signed granting the motions to dismiss both the counterclaims of the subcontractor.