**S. S. SILBERBLATT, INC.**
v.
**The UNITED STATES.**

No. 132–61.

United States Court of Claims.

Nov. 13, 1970.

Jerome Reiss, New York City, for plaintiff. Max E. Greenberg, New York City, attorney of record. Max E. Greenberg, Trayman, Harris, Cantor, Reiss & Blasky, New York City, of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recom-

mendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on October 14, 1969. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by plaintiff. Defendant has requested the court to adopt the commissioner's opinion, findings and conclusion. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover $29,300 and judgment is entered for plaintiff in that sum.

## OPINION OF COMMISSIONER

WILLI, Commissioner:

Plaintiff, a general contractor operating as a New York corporation, was the successful bidder on a $27,578,000 contract for a 1685-unit Capehart Housing Project for military personnel stationed at the Plattsburgh Air Force Base, Plattsburgh, New York.

The single controversy remaining in the case at this point relates to the defendant's refusal to accept a portion of the lumber that plaintiff proposed to use on the project. The other major claim originally in suit, relating to the topography of the site as depicted by the contract plans and specifications, was settled by agreement of the parties reached in the course of trial. The defendant's current acknowledgment on brief that it erred in taking a $29,300 change order credit for allegedly defective lumber in certain of the buildings that had already been enclosed when the impasse over lumber quality arose, has removed that aspect of the lumber claim from dispute.

What remains is plaintiff's contention that the contracting officer acted improperly when, about half-way through the job, he refused to permit construction to continue until the lumber in plaintiff's

job inventory and that which had been used in framing uncompleted units (and was still exposed) was inspected for quality by a disinterested official grading agency. After that was done, and the rejected lumber replaced, the job was satisfactorily completed within the contract's authorized performance period.

In accordance with the Disputes clause of the contract, plaintiff timely appealed the contracting officer's rejection of its claim for an equitable adjustment on the lumber inspection issue. No action having ever been taken on that appeal, suit was filed in this court and the question fully tried on the merits. (Findings 5, 39 *infra*.)

Contending that inspection of the lumber mid-way through performance of the job was improper under the contract as a matter of law and that, in any event, the problem of substandard lumber should have been corrected by an adjustment in the contract price, rather than enforced replacement, plaintiff seeks damages for the cost of the inspection, for the cost of replacing lumber, and for the cost of delay to the job as a whole that resulted from the time consumed by the inspection and subsequent replacement operations.

For the reasons that follow, plaintiff's claim is without merit.

Though the parties compiled a voluminous trial record in support of their respective positions, reflected in the detailed findings of fact accompanying this opinion, the determinative facts are both relatively few and uncomplicated.

The quality requirements for the 9½ million board feet of dimensional lumber needed for the contract were detailed in Section 5–02 of the specifications. (Finding 5.) The applicable quality standard was expressed in terms of the official grades promulgated by the West Coast Lumber Inspection Bureau (WCLIB), with the endorsement of the American Lumber Standards Committee. The latter body is appointed by the Secretary of Commerce and has the responsibility for formulating and maintaining

lumber quality standards that are used on an industry-wide basis. (Finding 6.)

After receiving the housing contract plaintiff contracted in writing with the Baldwin Lumber Company (hereinafter referred to as "Baldwin") to supply all of the dimensional lumber needed for the job. Plaintiff's purchase terms with Baldwin expressly included all of the lumber quality requirements contained in the specifications of its contract with the Government, including appropriate grademarking of each piece by either WCLIB or its counterpart PLIB (Pacific Lumber Inspection Bureau). (Finding 7.)

Baldwin was in the millwork business and had never sold lumber in the volume involved in its transaction with plaintiff. To meet its supply commitment Baldwin entered into a subcontract with First Lumber Corporation, a dealer that purchased lumber from mills and brokers for resale. (Finding 8.)

Under this tripartite arrangement plaintiff periodically notified Baldwin of its current lumber needs; Baldwin, in turn, advised First Lumber; and the latter then purchased the lumber from mills or brokers and had it shipped directly to Plattsburgh. (Finding 8.)

After securing its subcontract from Baldwin, First Lumber purchased the Quality Forest Products Corporation of Albert Lea, Minnesota.' First Lumber operated its acquisition primarily as a so-called "cut-up" mill, a mill that instead of using logs as raw material, buys undergrade lumber from other mills and by reducing its dimensions attempts to eliminate the flaws that caused it to be undergrade. After the reprocessing is done, the lumber is graded and sold on the market. As essentially scavenger operations, "cut-up" mills do not enjoy a good reputation in the lumber industry and a prudent builder would not knowingly purchase lumber for housing construction from a "cut-up" mill. (Finding 14.) In the instant case, neither plaintiff nor Baldwin knew where the lumber in any particular shipment would be coming from. First Lumber made its purchases from many different sources, including Quality Forest Products, various brokers, and lumber mills. In some instances the lumber was in easterly rail transit, in an unconsigned status, when First Lumber bought it. (Finding 10.)

Paragraph 6 of the General Provisions of plaintiff's contract with the Government provided as follows:

6. Inspection.

(a) Except as otherwise provided herein, all material and workmanship, if not otherwise designated by the Specifications, shall be subject to inspection, examination, and test by the Contracting Officer at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Department and the mortgagor-builder, or either of them, shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected, and rejected material shall be satisfactorily replaced with proper material, without charge therefor, and the eligible builder shall promptly segregate and remove the rejected material from the premises. If the eligible builder fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship, such failure may be treated as a default.

(b) The eligible builder shall furnish promptly, without additional charge, all reasonable facilities, labor and materials necessary for the safe and convenient inspection and tests that may be required by the Contracting Officer. All inspection and tests by the Department shall be performed in such manner as not unnecessarily to delay the work. Special, full size, and performance tests shall be as described in the Specifications. The eligible builder shall be charged with any additional cost of inspection when material and workmanship are not ready at the time inspection is requested by the eligible builder.

(c) Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity justifies it, unless otherwise stated in the Specifications; and such inspection and written or other formal acceptance, unless otherwise stated in the Specifications, shall be final, except for latent defects, departures from specific requirements of this Housing Contract, damage or loss in transit, fraud, or such gross mistakes as amount to fraud. Subject to requirements contained in the preceding sentence, the inspection of material and workmanship for final acceptance as a whole or in part shall be made at the site. Nothing contained in this paragraph shall in any way restrict the rights of the mortgagor-builder and the Department, or either of them, under any warranty or guaranty of material and workmanship.

Plaintiff contends that subparagraph (c) of the above provision obliged the Government to inspect the lumber at its source; that having failed to do so it cannot thereafter reject it for reasons of sub-specification quality or, in any event, cannot halt the contract work while an inspection is made.

Research discloses two cases in this court involving the construction of similar contract language. In both the question was the Government's right to ultimately reject certain fabricated materials even though it had inspected and approved them at the point of fabrication. Southwest Welding & Mfg. Co. v. United States, 413 F.2d 1167, 188 Ct.Cl. 925 (1969), disapproved a subsequent rejection whereas Merritt-Chapman & Scott Corp. v. United States, 178 Ct.Cl. 883, cert. denied, 389 U.S. 851, 88 S.Ct. 48, 19 L.Ed.2d 120 (1967), held that a preliminary acceptance based on source inspection did not bar later rejection. Significantly differing factual contexts accounted for the divergence in results. Since source inspections were actually made in those cases, the emphasis on the contract language here involved concerned the finality that it imparted to an acceptance following a source inspection rather than on the creation of an affirmative Government duty to make inspections at the source. Nonetheless, those cases do confirm the common sense proposition that when source inspections are made it is with the advance knowledge and understanding of the Government and its contractor and pursuant to prearrangement between them. The same premise is especially evident from the Board's opinion in Gordon H. Ball, Inc., 1963 BCA ¶ 3925, a case cited by plaintiff to illustrate the application of the language present here but again involving the effect on the Government's subsequent rejection rights of its earlier acceptance pursuant to an inspection of the goods at the source.

Plaintiff mistakenly urges that United States v. John A. Johnson & Sons, 65 F. Supp. 514 (D.C.D.Md.1945), aff'd. 153 F.2d 534 (4th Cir. 1946), squarely supports its thesis that the contract language present here requires the Government to make a source inspection of building materials, in that case brick used in a Government contract for public housing, under pain of forfeiture of its right to later reject the material as defective.

Though the prime contract with Johnson contained a source inspection clause like that here involved, all comments directed to it were strictly dictum. As the Court of Appeals observed, the question of the Government's liability to its contractor, Johnson, was not involved in the litigation. 153 F.2d 534, 542. The cited authority actually involved two consolidated Miller Act suits; a suit by a brick manufacturer against the masonry subcontractor, who had refused to pay for the brick rejected by the Government, and a suit by the subcontractor against Johnson, who had refused to pay for the corrective work necessitated by the Government's rejection. Judgment was for the plaintiff in each instance. Central to both liability determinations were the factual conclusions (1) that, unlike the

lumber involved in this case, the disputed brick met the contract specifications and (2) that any deficiency in its performance as an exterior surfacing material was attributable to the fact that the specifications did not call for a sufficiently high quality of brick to do the job intended. Considered in the light of these factual essentials, the trial court's gratuitous observations concerning the Government's obligations and risk exposure under the source inspection clause become almost totally abstract. 65 F. Supp. 514, 522.

The undisputed facts of the instant case impel the conclusion that the dimensional lumber that plaintiff purchased from Baldwin was not within the scope of the source inspection clause of paragraph 6 of the General Provisions, *supra*, whatever the legal effect of that clause in situations where it applies.

The direct evidence points singularly to the fact that neither the Government, plaintiff, Baldwin, nor Baldwin's sole subcontractor, First Lumber, had any idea or expectation at the time that the lumber was procured that it was to be inspected at its point of origin. (Finding 10.) Not until after the dispute over lumber quality had matured into an enforced work stoppage did plaintiff first suggest that the Government had a contractual obligation to inspect the lumber at its source. By then, all of the lumber for the job had long since been delivered to Plattsburgh. In the absence of compelling indications to the contrary, not present here, the construction that the parties have themselves placed on a contractual provision *ante litem motam* should not be disturbed when, at a later date, the meaning of the provision is called into question by one of them. Chahroudi v. United States, 124 Ct.Cl. 792, 797–798 (1953), and authority cited therein.

First Lumber filled the Baldwin order by purchasing from a great many different mill and broker sources, frequently not even knowing itself where the lumber involved actually originated; some of it being in actual rail transit when purchased. Accordingly, it simply would not have been feasible for the Government to have undertaken a source inspection even if it had wanted to.

Finally, it is to be noted that the clause in question envisions an inspection at source " * * * whenever the quantity justifies it * * *." With the possible exception of the lumber that came from Quality Forest Products, First Lumber's subsidiary "cut-up" mill in Minnesota, there is no evidence that in any instance there was sufficient quantity involved to justify the expense of a source inspection.[1] In any event, neither the plaintiff nor anyone acting on its behalf ever notified the Government of the source and quantity of any portion of the lumber purchased for use in performance of the contract. The nature of the Quality Forest Products operation being what it was, the failure of plaintiff and its contract suppliers to cause a Government inspection there is understandable.

■ For the above reasons, plaintiff's contention that the Government was obliged by contract to inspect the lumber at its source is untenable.

Because of the size of the overall housing contract plaintiff was required to deal in very large quantities of materials. Delivery of the dimensional lumber alone required over 400 rail cars. To handle this logistical problem plaintiff rented an 8-acre tract, called the Day Farm, that had a private rail siding and was located 3–4 miles from the construction site. Plaintiff used this property as its receiving and storage yard for the job.

Relying on a 10-day reinspection provision of the WCLIB's grading rules as evidence of an established trade practice, plaintiff suggests that the Government should have inspected the lumber for

---

1. In plaintiff's *Johnson* case, *supra*, on the other hand, the trial court expressly found that the quantity of brick involved justified inspection at the source. 65 F. Supp. at 522.

compliance with the quality specifications of the contract upon its arrival at the Day Farm.

■ However valid the trade rule that a buyer of lumber graded by WCLIB has only 10 days after delivery to him within which to challenge the grade and call for a reinspection, the rule has no application to the Government in this case since it was not a buyer of lumber. Thus, while this trade practice may have application to plaintiff, Baldwin, or First Lumber, it imposes no inspection obligation or peril of waiver on the Government. Plaintiff does not contend that its own contract with the Government created any duty on the latter to inspect the lumber on arrival at the storage yard.

Aside from the absence of any legal obligation to do so, it would not have been reasonable for the Government to have undertaken an inspection of the lumber on arrival at Plattsburgh.

As stated, the lumber arrived in rail box cars. It was not loose in the cars but bound into large bundles by steel strapping. Plaintiff verified quantity by tallying the shipments as they were unloaded. The bundles were immediately stacked, 3 to 4 high, for storage in the yard pending later transportation to the building site. At this point, the lumber could not have been inspected without dismantling the bundles and that procedure, including reassembly and re-strapping for storage and final truck delivery to the job, would have been so cumbersome and time-consuming as to have been unreasonable in the circumstances. (Finding 9.)

The notice to proceed under the contract in suit was issued May 23, 1957. Lumber deliveries to the yard at the Day Farm began in November 1957, and framing of the buildings started in March 1958. Plaintiff's planned production rate called for framing 20 dwelling units per day and this pace was achieved by the summer of 1958. To meet this production schedule lumber, still in the baled form in which it was received by rail, was loaded on trucks at the Day Farm by fork lift, delivered to the building where it was to be used, and dumped on the ground. The lumber was ordinarily used in framing that was begun 24 to 48 hours thereafter. The overall size of the job and the limited time that the lumber was at the actual building site prior to use created a situation in which the first reasonable opportunity afforded the Air Force inspectors to adequately examine the dimensional lumber for compliance with quality specifications was after the framing had been erected and before it was enclosed with interior and exterior covering. (Finding 9.) In fact, this was the inspection procedure that was employed.

At first the architect-engineer required the Air Force inspectors to issue tickets, in triplicate, on which deficiencies requiring correction were noted. One copy was for the individual who had done the deficient work; one copy for the plaintiff's administrative officer on the job; and the third for the contracting officer.

The deficiency ticket system was abandoned in mid-summer 1958 at plaintiff's request and was replaced by an arrangement wherein a card bearing a description of each of the several phases of work involved in the construction of a building was tacked on the outside of each building in a conspicuous place. Under this plan the foreman overseeing the phase of work in question would signify its readiness for inspection by initialing the appropriate work description appearing on the card. Thus notified, an Air Force inspector would check the indicated work and if he found it acceptable would place his initials on the card, signifying that plaintiff could proceed with the next phase in the work sequence. (Finding 11.)

Insofar as inspection of the framing lumber was concerned, the card plan proved no more satisfactory than the deficiency ticket system that it displaced. This was true primarily because of the manner in which plaintiff elected to supervise its framing operations. Instead of the carpentry superintendent being

held responsible for inspecting the completed framing, and making corrections and replacements where necessary, plaintiff delegated this responsibility to its wallboard subcontractor. Naturally that subcontractor's primary interest was in beginning and completing his own phase of the work as quickly as possible. As might be expected, his sole criterion for suitability of framing was whether wallboard or sheetrock could be fastened to it. The subcontractor's anxiety to get on with his phase of the work inevitably led to wallboard operations being begun before the Air Force inspectors had examined the framing and signified approval by initialing the card on the building. (Finding 12.)

Despite the above difficulties encountered in lumber inspection procedures, it was not until September 1958 that serious problems arose. At that point the Air Force's chief inspector noted a large proportion of bad lumber arriving at the building site; lumber containing oversize knots, splits and dry rot. He also observed that most of this bad lumber bore the grademarks of the Hickox Inspection Service and the A. E. Green Inspection Service, the two grading agencies that operated at First Lumber's cut-up mill in Minnesota, previously described. After going to the storage yard at the Day Farm and failing to obtain any satisfactory explanation from the foreman there as to the reason for the sudden influx of bad lumber, the inspector called the problem to the attention of plaintiff's administrative officer and assistant project superintendent, both of whom acknowledged that the lumber in the yard was excessively knotty, rotten, and crooked, and gave assurances that such material would not be sent to the job site. The inspector also informed plaintiff's president of the problem. (Finding 13.)

Notwithstanding the apparent recognition by all concerned of the largely inferior quality of the lumber remaining in plaintiff's yard inventory and its assurances that such material would not be used on the job, the problem did not diminish; in fact it became more acute.

By mid-September the proportion of bad lumber being used in the framing grew so large that it became physically impossible for the Air Force inspectors to examine and reject it on an individual piece basis. Moreover, such rejections as they did make were frequently met with disagreement and argument from plaintiff's representatives as to whether replacement was actually necessary. (Finding 15.) The recalcitrance of plaintiff's supervisory personnel coupled with the wallboard subcontractor's determination to proceed with his work as quickly as possible compounded the difficulties occasioned by the bad lumber.

Having received reports from the architect-engineer depicting the situation outlined above, the contracting officer visited the buildings where framing was in progress and confirmed the accuracy of those reports. In addition to observing the pervasive use of obviously bad lumber, which typically bore the stamp of the Hickox and A. E. Green inspection services, he discovered instances where the Air Force inspectors' initials had been forged on the building inspection cards erroneously indicating that the framing had been approved. On September 16, following his inspection at the buildings, the contracting officer went to the yard at the Day Farm. He selected a bale of lumber at random and broke it open. While the outside pieces bore the WCLIB gradestamp, none of the interior members bore any stamp at all. (Finding 16.)

In the face of his findings at both the construction site and the storage yard, including the indications of fraud, the contracting officer became thoroughly alarmed. He telephoned the Army's Lumber Control Office at Saint Louis to report his problem and request that one of the Office's graders be sent to Plattsburgh to examine the lumber. He was told that all of the Army graders were tied up on other work at the time. The Control Office, whose function is the procurement of all lumber purchased by the Army, suggested that the contracting officer contact WCLIB or PLIB and at-

tempt to secure grading assistance there. After first advising plaintiff's administrative officer of what he planned to do, the contracting officer telephoned WCLIB on the West Coast and was referred to one of their supervisor-inspectors, Charles McNew, who was then in New York City. McNew agreed to come to Plattsburgh and undertake a preliminary inspection to determine whether the lumber that plaintiff was using and proposing to use was really as far wide of the lumber quality specifications as the Government representatives, none of whom were qualified lumber graders, believed it to be.

McNew, with over 30 years' experience in lumber grading and 17 years' employment by WCLIB as a grade supervisor, arrived at Plattsburgh on September 19. That morning he was given a copy of the contract specifications covering lumber quality and was accompanied by a representative of the architect-engineer and the chief inspector on the job for the Air Force to the Day Farm where he graded random samples of the lumber in storage there. For the most part, he found the lumber that he examined to be substantially below the grade requirements of the contract. Though in most instances such lumber bore no grade markings at all, there were some pieces of decidedly inferior quality that were nonetheless grademarked by the A. E. Green or Hickox services as being of a quality equal to or above the requirements of the contract. (Finding 18.) In the afternoon the contracting officer and plaintiff's administrative officer joined the group. They returned to the Day Farm where the morning's experience was generally repeated. They then went to some of the buildings where the framing was still exposed. McNew found approximately 30 percent of the ceiling joists and 90 percent of the studs (species other than redwood) to be below the contract specifications. After the inspection tour the parties returned to the architect-engineer's office where McNew's findings of substantial grade deficiencies and large amounts of un-

marked lumber were discussed, with particular emphasis on how the problem might be remedied. As a practical solution, the contracting officer suggested that in view of the very large quantity of material involved, plaintiff could call in a qualified and disinterested grading agency and have the lumber in the exposed framing and at the Day Farm graded in the manner contemplated by the specifications. The administrative officer agreed that this was a sound proposal but indicated that he would have to secure the approval of plaintiff's president. Following that discussion the contracting officer issued plaintiff the following written directive (finding 20):

> You are hereby directed to remove and replace all lumber that is not grade marked or certified in accordance with Section 5–05, Part A of contract specifications.

> You are further directed that all lumber not in accordance with the above specification be removed from the housing site.

Being promptly advised of the foregoing developments by his administrative officer, plaintiff's president shortly came to the job site to personally look into the matter. Once there the contracting officer toured the project with him and pointed out examples of the inferior lumber that had caused the issuance of the September 19 directive. The proposition that a large portion of the lumber was in fact defective having been established, the two then discussed the question of resolving the problem and the contracting officer reiterated the suggestion that he had earlier made to plaintiff's administrative officer following the McNew inspection. Plaintiff's president agreed that calling in a disinterested agency to grade the exposed lumber in the buildings and the lumber in storage at the Day Farm would be a proper procedure and further agreed that he would contact either WCLIB or PLIB, the two grading agencies specified in plaintiff's contract with the Government, for that purpose. (Finding 21.)

Following his meeting with the contracting officer, plaintiff's president did not contact either of the West Coast grading services as he had agreed. Instead, he telephoned Baldwin Lumber, his supplier, and demanded that it send an inspection agency to Plattsburgh to grade the lumber. Baldwin, in turn, contacted its supplier, First Lumber, who sent a grader employed by the Hickox Inspection Service to the site. The grader arrived September 22 and proceeded to grade and stamp some of the exposed lumber in the buildings. On September 25 the contracting officer first became aware that someone was grading lumber in the buildings. Upon inquiry of plaintiff's president, he learned that the grader was a representative of the Hickox Inspection Service. Since it had already been established that some of the patently defective lumber on the job had been misgraded by that agency, the contracting officer objected to the idea of having its personnel do the grading that had been agreed to by plaintiff. Faced with this objection, which was clearly reasonable in the circumstances, plaintiff's president stated that he had no fixed preference as to who did the grading and thereupon telephoned to Portland headquarters of WCLIB and requested that grading services be supplied at Plattsburgh. (Findings 22, 23.)

Later the same day the contracting officer issued a written directive to plaintiff incorporating the substance of the agreement that he had reached with its president concerning grading of the lumber as a necessary preliminary to enclosure of the buildings that had already been framed. (Finding 22.) By letters of September 26 and October 1, plaintiff formally advised Baldwin of the defective quality of the framing lumber, of the agreed procedure for grading and replacement of substandard material, and of the fact that all costs of these operations would be charged to Baldwin. (Findings 24, 25.)

In late September, while the parties were in the process of concluding the arrangements that led to the retainer of WCLIB by plaintiff, a representative of the Chemical Corn Exchange Bank, plaintiff's mortgagee for this project, arrived at Plattsburgh. This individual, Mr. Norman, was employed by an engineering consulting firm that the bank had insisted be retained by plaintiff in order to resolve various pending problems and expedite satisfactory completion of the job. Norman had extensive experience as a construction superintendent and was well qualified to act as a trouble shooter. (Finding 26.)

Upon his arrival at the site Norman examined the exposed lumber in the buildings and the storage inventory at the Day Farm. As others had concluded, he found it to be extensively defective. His findings prompted him to recommend that plaintiff's carpentry superintendent be dismissed, which was done, and that outside lumber graders be called in; the procedure ultimately agreed to by plaintiff's president and the contracting officer. (Findings 26, 27.)

Pursuant to plaintiff's letter request of September 25, three WCLIB graders arrived at Plattsburgh on September 28. They met with plaintiff's job supervisors and then began to inspect the exposed lumber in the buildings. The grading force was augmented by four additional WCLIB men and the grading job in the buildings and at the Day Farm was completed in an efficient and expeditious manner by October 23. (Findings 28, 32.) In fact, on that date plaintiff's administrative officer wrote WCLIB a commendatory letter. (Finding 35.)

Inspection in the buildings revealed that a large number of the studs were redwood, a species not included among those designated for use as studding in the contract specifications (finding 5) and one that the WCLIB was not officially authorized to grade. The parties overcame this technical difficulty by agreeing that they would accept the informal judgment of the WCLIB graders. (Finding 21.) Evaluated under this arrangement, the redwood was found to be of generally good quality.

On October 7, 1958, approximately 10 days after the WCLIB graders had begun their work, plaintiff's president, in a letter to the contracting officer, for the first time took exception to the grading operation then under way; asserting that substantially all of the lumber met the contract specifications and that in any event the Government had the duty of inspecting it at its source. Despite receiving this protest, the contracting officer permitted the WCLIB men to continue their work. (Finding 31.)

The findings as to grade were generally consistent among the several WCLIB representatives and as between the exposed framing in the buildings and the lumber in storage at the Day Farm.

Aside from the redwood, which was found to be adequate, approximately 80 percent of the installed studs and 30 percent of the ceiling joists were of a quality significantly below that called for in the contract specifications. There was no redwood at the Day Farm and some 80 percent of the fir and hemlock was well below the required grade. In the course of their work, the WCLIB graders, who collectively pronounced this to be the worst lot of lumber that they had ever been called upon to grade, noticed that invariably the defective lumber that was stamped as being up to quality bore the legend of Quality Forest Products Corp. and the grademark of either the A. E. Green or Hickox Inspection Services. (Findings 33, 34.)

At the trial of this case plaintiff adduced no credible evidence rebutting the findings and conclusions of the WCLIB personnel. Those findings of substantial and extensive deficiencies in the quality of the lumber that plaintiff was using and proposing to use clearly demonstrate that the contracting officer was well within his rights, and indeed his obligations, in refusing to approve further construction in the absence of the grading arrangement to which plaintiff's president agreed in advance. Having made that agreement with the certain awareness that it represented the only possible solution to the dilemma in which its lumber suppliers had placed it, plaintiff cannot now disavow it by pointing to general contract language indicating that all inspections were to be made by the Government, rather than the contractor.

Finally, after essentially finessing the merits of the issue of lumber quality as a matter of proof, plaintiff contends at length that the Government erred in dealing with the problem of defects in the lumber as it did. Instead of requiring compliance with the contract specifications, the argument goes, the Government should have permitted plaintiff to proceed according to it own dictates and then settled the matter by a downward adjustment in the contract price; this in the spirit of conformity with alleged trade practice.

Assuming both the existence of such a practice and its amenity to situations involving technical or marginal shortcomings under contract specifications, it has no proper place in the context of the significant and pervasive lumber deficiencies present on the basically unchallenged facts of this case. Moreover, this court has recently held that trade practice in the building industry cannot override an unambiguous contract provision. WRB Corp. v. United tSates, 183 Ct.Cl. 409, 436 (1968).

The specifications involved here were both clear and reasonable. The Government did no more than insist on compliance with them. H.L.C. & Associates Constr. Co. v. United States, 367 F.2d 586, 598, 176 Ct.Cl. 285, 306–307 (1966); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 868, 181 Ct.Cl. 607, 628 (1967). The suggestion that the Government's action, manifestly reasonable in the circumstances, was motivated by the contracting officer's animosity towards plaintiff's president is completely unsupported by the evidence as a whole. (Finding 38.)

As noted at the outset, after completion of the contract and over the objection of the contracting officer, the Air Force authorities issued a change order to the contract under which they withheld $29,-

300 alleged to represent a *quantum meruit*-type deduction for defective lumber presumed to have been already enclosed in the buildings at the time that the WCLIB graders arrived on the scene. No evidence was adduced to support the proposition that any of such lumber was in fact defective and, as noted, the Government now concedes that the deduction was improper. (Finding 37.)

Plaintiff's various contentions, aside from the uncontested deduction item, being without merit, judgment should be entered for it in the amount of $29,300.