**WESTERN STATES CONSTRUCTION CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–1257C.

United States Claims Court.

July 24, 1992.

Terry W. Scoby, Boulder, Colo., for plaintiff. Edward L. Serr, of counsel.

James W. Poirier, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and James M. Kinsella, Washington, D.C., for defendant.

OPINION

BRUGGINK, Judge.

This action was brought pursuant to the Contract Disputes Act. 41 U.S.C. §§ 601–613 (1988). Pending is defendant's motion for summary judgment. For the reasons that follow, the court concludes that defen-

dant has not demonstrated an entitlement to entry of judgment in its favor.

## FACTUAL BACKGROUND

On March 3, 1988, the Kansas City District, U.S. Army Corps of Engineers awarded Contract No. DACA45–88–C–0062 to the plaintiff, Western States Construction Company. The contract was for the construction of the B–2 Support Facilities, Package VII, Whiteman Air Force Base, Missouri. The work consisted of furnishing all plant, labor, materials, and equipment and performing all work for an Integrated Maintenance Shop, a Munitions Equipment Maintenance Shop, two igloos, two flammable liquids storage buildings, and other related site work.

Western contracted with Harold G. Butzer, Inc. ("Butzer") to perform certain plumbing and mechanical work in connection with the project, including installation of underground cast iron soil pipe ("CISP"), per Section 15400 of the Specifications. Butzer asserts that it interpreted the contract specifications to provide that underground CISP was not to be wrapped with protective tape and that its bid, and therefore plaintiff's, did not include the additional costs associated with wrapping.

Section 15400 of the specifications is entitled, "Plumbing, General Purpose." The following are the pertinent provisions:

-**Subparagraph 5.1**, "Pipe and Fitting Material," reads in part:

Pipe material for various services shall be in accordance with Tables III and IV, attached to this section. . . .

-**Table III** of the specifications allows for four kinds of material for pipe and fittings used for underground building soil, waste, and storm drain:

1. Cast iron soil pipe and fittings, hub and spigot, ASTM A 74
2. Copper drainage tube, (DWV), ASTM B 306
3. Wrought copper and wrought copper alloy solder-joint drainage fittings. ANSI B16.29
4. Cast copper alloy solder-joint drainage fittings, DWV, ANSI B16.23.

-**Subparagraph 19.7**, "Corrosion Protection for Pipe and Fittings," specifically provides:

Exterior surfaces of metallic pipe and fittings that are installed underground shall be thoroughly cleaned of foreign matter by wire brushing and solvent cleaning. Using tape conforming to AWWA (American Water Works Association) C203 and primer as recommended by the tape manufacturer, the pipe shall be primed and immediately wrapped with the tape, applied with a 50 percent overlap. Joints and fittings shall be covered with the same primer and tape. Fittings shall be coated and wrapped after piping has been tested. Pipe shall be coated and wrapped during installation. Coating must be 16 mil thick. (emphasis supplied)

As per subparagraph 5.1 and table III of the contract specifications, Butzer was permitted to choose from four kinds of material for the pipes and fittings to be used for the underground building soil, waste, and storm drain. Although Butzer could have chosen three different types of copper pipe, it elected to install CISP.

On August 22, 1988, Western, at the behest of Butzer, forwarded to the Government a request for clarification as to whether subparagraph 19.7 of the specifications required wrapping of underground CISP with protective tape. Attached to the request was a letter from Butzer to Western explaining why it interpreted the specifications not to call for wrapping of CISP. The letter warned that if wrapping of CISP was required by the Government, Butzer intended to file a claim for all additional costs associated with this extra requirement.

The Government forwarded its reply to the request the next day, stating that wrapping was required. Butzer then proceeded to wrap the pipes according to the Government's directive. On November 28, 1989, Western forwarded to the Government its claim in the amount of $95,195.00 for the increased costs associated with the Government's order to wrap the CISP. By letter dated December 7, 1989, the Resident

Engineer, acting as the authorized representative of the Contracting Officer ("CO"), denied Western's request. By letter dated April 27, 1990, Western requested the CO's final decision on its claim for an equitable adjustment concerning the wrapping of the underground CISP. In a decision received on July 10, 1990, the CO denied Western's claim for an equitable adjustment. On July 2, 1991, Western filed its complaint here.

## THE PARTIES' CONTENTIONS

The Government contends that the contract specifications in subparagraph 19.7 are unambiguous. It reasons as follows. The express language of subparagraph 19.7 of the specifications requires that underground "metallic pipe" be wrapped with protective tape. In accordance with general principles of contract interpretation, this court must give to the term "metallic pipe" its plain and ordinary meaning. *American Science & Eng'g, Inc. v. United States*, 229 Ct.Cl. 47, 57, 663 F.2d 82, 88 (1981). In doing so, it is evident that "metallic pipe" encompasses CISP, and therefore, the contract required wrapping of the pipes at issue. Western cannot demonstrate that its interpretation of the contract is a reasonable one. According to the Government, were the court to accept Western's contention that the contract did not require the wrapping of the CISP, such an interpretation would render meaningless the language of subparagraph 19.7. *See United Pacific Ins. Co. v. United States*, 204 Ct. Cl. 686, 692, 497 F.2d 1402, 1405 (1974). It points out that it has the right to insist upon performance in strict compliance with contract specifications, *Transtechnology Corp. v. United States*, 22 Cl.Ct. 349, 357 (1990), and that it is permitted to make its specifications more stringent than applicable industry standards so long as it does so clearly and unambiguously. *H–D Dev. Co.*, VABCA No. 2453, 88–2 B.C.A. ¶ 20,676, 104, 516 (1988). Given the fact that the issue before the court is the interpretation of an unambiguous contract provision, summary judgment is appropriate.

To this, Western responds that the phrase "metallic pipes" in subparagraph 19.7 of the contract specifications means something different than what the Government says it means. According to plaintiff, in the context of subparagraph 19.7, the term "metallic pipes" does not include CISP. Western points to the affidavits of Mr. Harold G. Butzer, Mr. Rodney M. Schulte, and Mr. Keith E. Andrews. Schulte, who prepared the estimate for the subcontractor, Butzer, avers that "[w]hen I read paragraph 19.7 of section 15400 of the specifications prior to preparing the estimate, I interpreted it to apply to bare steel pipe when installed underground. To me, it did not apply to factory-coated cast iron soil pipe." Harold Butzer, of the same firm, reads the provision in the same way. Andrews, who prepared an estimate for a competitor, recites that "not wrapping this pipe was consistent with our interpretation of the Contract...."

It is plain enough from the affidavits of these men that their interpretation of the contract language is based on the existence of a customary trade practice in the plumbing industry not to wrap factory-coated CISP with any type of protective tape. According to Butzer, a subcontractor in the plumbing industry for over forty years, he can recall only one instance among the thousands of contracts that he has performed in which an additional coating or wrapping was used on factory-coated CISP. Due to long-standing trade practice in the construction industry, CISP is not wrapped with protective tape unless the specifications explicitly mention that type of pipe when specifying the wrapping requirement.

Both Schulte and Andrews aver that prior to working at Whiteman AFB they had never been involved in a job where factory-coated CISP was covered with tape or any other protective wrapping. Andrews adds that in previous and subsequent projects, using virtually identical specifications, the Government specifically excluded this type of pipe from wrapping requirements.

Western points out that four years before the project was awarded, the Corps of Engineers contracted for other work involving CISP at this same location. The

earlier contract contained a clause substantively identical to subparagraph 19.7. During the course of performing that contract, an unidentified government representative interpreted "metallic pipe" not to include CISP. Western emphasizes the fact that the same government representative who required Butzer to wrap the CISP had informed the earlier contractor that wrapping of such pipe was not required by the same specification language. Western does not allege that it was aware of this fact prior to bidding on the project, but offers this as evidence of the reasonableness of its interpretation.

## DISCUSSION

Defendant characterizes the evidence upon which plaintiff relies as custom or trade practice and points to a line of decisions holding that such evidence is inadmissible if it conflicts with the plain meaning of the contract. If the contract provisions in question are clear and unambiguous, then evidence of a contrary trade custom is irrelevant. This position was clearly set forth in *Bowers Hydraulic Dredging Co. v. United States*, 41 Ct.Cl. 214 (1906), *aff'd*, 211 U.S. 176, 29 S.Ct. 77, 53 L.Ed. 136 (1908), where the court concluded: "the specifications, which are made part of the contract, are plain and unambiguous.... This being so, any other method of *measurement in place*, even though customary, is excluded by the terms of the contract." *Bowers Hydraulic Dredging Co.*, 41 Ct.Cl. at 229–230. To like effect is *Crooks Terminal Warehouses, Inc. v. United States*, 92 Ct.Cl. 401 (1941): "[a]n express provision in a written contract cannot be varied or modified by custom or usage, but ... [where] the provisions of the contract are ambiguous ... evidence of custom or usage may be received to show the intention of the parties." *Crooks Terminal Warehouses, Inc.*, 92 Ct.Cl. at 416.

More recently, in *WRB Corp. v. United States*, 183 Ct.Cl. 409 (1968), the Court of Claims held that "[a] trade practice in the building industry of using masonite doors on paint-grade cabinets cannot properly be permitted to overcome an unambiguous contract provision [requiring wood doors on paint-grade cabinets]." *WRB Corp.*, 183 Ct.Cl. at 436. The court in *WRB Corp.* did, however, permit the use of trade custom to help define the ambiguous term "attic space" in the same contract. *WRB Corp.*, 183 Ct.Cl. at 454. A long line of decisions in this circuit is to the same effect. *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed.Cir.1991) ("In contract interpretation, the plain and unambiguous meaning of a written agreement controls."); *Craft Mach. Works, Inc.*, 926 F.2d at 1115 n. 2 ("[E]vidence of trade practice does not trump unambiguous contract language."); *R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1572 (Fed.Cir. 1990) ("Neither a contractor's belief nor contrary customary practice ... can make an unambiguous contract provision ambiguous, or justify a departure from its terms."); *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed.Cir. 1987) ("[E]vidence of trade usage and custom cannot be used to vary or contradict the terms of a contract."); *George Hyman Constr. Co. v. United States*, 215 Ct.Cl. 70, 81, 564 F.2d 939, 945 (1977) ("A trade practice cannot prevail over unambiguous provisions of a contract...."); *Merando, Inc. v. United States*, 201 Ct.Cl. 28, 31, 475 F.2d 603, 605 (1973) (same); *Northwestern Indus. Piping, Inc. v. United States*, 199 Ct.Cl. 540, 550–51, 467 F.2d 1308, 1314 (1972) ("[S]ince we have decided that the contract specifications were clear and unambiguous, and since trade practice cannot override unambiguous contract provisions (citation omitted), we do not have to consider the question of what was required by trade practice in the industry."); *S.S. Silberblatt, Inc. v. United States*, 193 Ct.Cl. 269, 288, 433 F.2d 1314, 1323 (1970) ("[T]rade practice in the building industry cannot override an unambiguous contract provision."); *McDevitt Mechanical Contractors, Inc. v. United States*, 21 Cl.Ct. 616, 620 (1990) ("Where the provisions of a contract are unambiguous, an inconsistent trade practice cannot prevail."); *Avedon Corp. v. United States*, 15 Cl.Ct. 771, 778 (1988) ("Trade custom or usage cannot be

used to contradict plain contractual language.").

Plaintiff relies heavily on a decision which at first blush seems to be inconsistent with the general rule in the circuit. *Gholson, Byars and Holmes Constr. Co. v. United States*, 173 Ct.Cl. 374, 351 F.2d 987 (1965). In *Gholson*, the Court of Claims held that contract language must be given its trade meaning even though its ordinary meaning is unambiguous. According to the *Gholson* court, "trade usage or custom may show that language which appears on its face to be perfectly clear and unambiguous has, in fact, a meaning different from its ordinary meaning." *Gholson*, 173 Ct.Cl. at 395, 351 F.2d at 999. According to the court:

> The Board's failure to consider the evidence of trade practice and custom on the basis of absence of ambiguity was in error. For the principle is now established in this court (and almost every other court) that in order that the intention of the parties may prevail, the language of a contract is to be given effect according to its trade meaning notwithstanding that in its ordinary meaning it is unambiguous.

*Id.* Therefore, according to *Gholson*, evidence of trade custom is relevant to show the reasonableness of one party's interpretation of a contract term.

Among other cases cited, the primary opinions relied on in *Gholson* are *Ricker v. United States*, 126 Ct.Cl. 460, 115 F.Supp. 193 (1953), and *Buffalo Merchandise Warehouses, Inc. v. United States*, 115 Ct.Cl. 568, 88 F.Supp. 276 (1950). In the latter decision, the court held: "Even though, to the uninitiated, the words of a contract would seem to have a fairly plain meaning, that meaning will be altered to correspond with the recognized usage of the language of the trade." *Buffalo Merchandise Warehouses, Inc.*, 115 Ct.Cl. at 572, 88 F.Supp. at 277.

The defendant in *Gholson* contended that the plaintiff had not shown that the government was actually aware of the trade custom and hence that the government may not be bound by it. However,

the court concluded that "such knowledge will be presumed when (as here) the evidence shows the usage was an established, well-defined and obviously well-recognized one." *Gholson*, 173 Ct.Cl. at 396, 351 F.2d at 1000.

*Gholson* thus goes beyond the typical expression of the general rule in this circuit in that it permits the introduction of trade custom and usage to provide support for an alternative interpretation to the "ordinary" meaning of a term. Ambiguity must still be demonstrated, but it exists when there are competing interpretations, one of which is a specialized trade meaning. This approach, although not explicitly articulated in the circuit before or since *Gholson*, is squarely consistent with the Restatement and general commentaries. According to the *Restatement (Second) of Contracts:*

> Language and conduct are in general given meaning by usage rather than by the law, and ambiguity and contradiction likewise depend upon usage. Hence usage relevant to interpretation is treated as part of the context of an agreement in determining whether there is ambiguity or contradiction as well as in resolving ambiguity or contradiction.

*Restatement (Second) of Contracts* § 220 cmt. d (1981).

> An agreement is supplemented or qualified by a reasonable usage with respect to agreements of the same type if each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage.

*Id.* § 221.

> Unless otherwise agreed, a usage of trade in the vocation or trade in which the parties are engaged or a usage of trade of which they know or have reason to know gives meaning to or supplements or qualifies their agreement.

*Id.* § 222(3).

Similarly, *American Jurisprudence 2d* states:

> According to the prevailing view, where trade custom or usage attaches a special meaning to certain words or terms used

in any particular trade or business, it is competent for the parties ... to show the peculiar meaning of them in the business or trade to which the contract relates, not for the purpose of altering, adding to, or contradicting the contract, but for the purpose of elucidating the language used as a means of enabling the court to interpret the contract language according to the intentions of the parties.

17A Am.Jur.2d *Effect of usage, custom, or course of dealing* § 364 (1991).

The academics have given their benediction to the approach of the *Restatement* and *American Jurisprudence*. Professor Corbin is clearly in accord:

In numberless well-considered cases, proof of local or trade usage, custom, and other circumstances has been allowed to establish a meaning that the written words of the contract would never have been given in the absence of such proof. It is not necessary that words should be unusual words or words that are "ambiguous on their face" in order to admit evidence of special usage. Such evidence often establishes a special and unusual meaning definitely in conflict with the more common and ordinary usages....

... The final interpretation of a word or phrase should not be adjudged without giving consideration to all relevant word usages, to the entire context and the whole contract, and to all relevant surrounding circumstances.

....

.... Seldom should the court hold that written words exclude evidence of the custom, since even what are often called "plain" meanings are shown to be incorrect when all the circumstances of the transaction are known; and usages and customs are a part of those circumstances by which the meaning of words is to be judged.

3 Arthur L. Corbin, *Corbin on Contracts* § 555 at 232–39 (1960).

Professor Williston is also in agreement with this line of reasoning:

[I]t may be said broadly that any usage with knowledge of which both parties are chargeable is always admissible to show the meaning of the language employed. Usage is an ordinary means of proving the local or technical meaning of language, and even language which is normally clear and unambiguous may be shown by usage to bear, under the circumstances of the case, a meaning different from its normal sense.

5 Samuel Williston, *Williston on Contracts* § 648 at 6–7 (3d ed. 1961).

He goes on to say that,

The correct rule with reference to the admissibility of evidence as to trade usage under the circumstances here presented is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, yet if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense as shown by such trade usage. Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, inasmuch as by reason of the usage the words are used by the parties in a different sense. *Id.* § 650 at 21.

Professor Grismore discerns a series of cascading presumptions, which lead to the same effect:

[C]ertain presumptions are habitually indulged in regard to the standards to be applied in the interpretation of language.... They are as follows:

1. The ordinary or popular sense of words as used throughout the country is preferred, in the absence of circumstances indicating a contrary understanding.

2. Technical terms and words of art are to be given their technical meaning, unless the circumstances indicate a contrary understanding.

3. Where words have come to have an established meaning in the law, that

meaning will be adopted, in the absence of competent affirmative evidence of a contrary understanding.

4. The usages of a trade, or a locality, or a profession, etc., will always supersede the ordinary or popular sense of words where the situation is such as to justify the assumption that these special usages would more nearly approximate the understanding of the parties. If the special usage relied upon is in fact the settled habit of expression of the group in question and not merely the expression of a few persons, and if the parties to the contract are members of the group, then the special usage will always prevail in the absence of competent affirmative evidence that the parties understood that some other meaning was to be attributed to the language in question. But if one of the parties is not a member of the trade or other group, then the special usage of that group will not be adopted unless he had actual knowledge of it, or unless it is so well known that it is fair to assume he must have had knowledge of it.

Grover C. Grismore, *Law of Contracts* § 106 at 165–66 (1947).

Finally, Professor Farnsworth also endorses this same line of reasoning:

In determining whether contract language is ambiguous, a court is not limited to the face of the contract itself. It may look at the circumstances surrounding the making of the contract and at any relevant usage of trade, course of dealing, and course of performance....

II E. Allan Farnsworth, *Farnsworth on Contracts* § 7.12a at 279–80 (1990).

Farnsworth continues:

Under the [Uniform Commercial] Code "any usage of trade in the vocation or trade in which [the parties] are engaged or of which they are or should be aware" is said just like a course of dealing, to "give particular meaning to and supplement or qualify terms of an agreement."

*Id.* § 7.13 at 283.

■ In sum, the reasoning of *Gholson* is not only in accord with the general commentaries, but it is also fundamentally compatible with the line of decisions relied on by the Government. *Supra* at p. ——. In the court's view, the guiding principle is that the contract controls the work to be done and cannot be trumped by a trade practice, regardless of how prevalent. This is the import of cases such as *R.B. Wright Constr. Co.*, 919 F.2d at 1572, *WRB Corp.*, 183 Ct.Cl. at 436, and *Bowers Hydraulic Dredging Co.*, 41 Ct.Cl. at 229–30. If the contract calls for three coats of paint, as it did in *R.B. Wright Constr. Co.*, then the fact that industry practice only calls for one coat is irrelevant. 919 F.2d at 1572. There is no question in that circumstance what the phrase "three coats" means. From the contractor's perspective it is only too clear. The term "three" has no special meaning in the construction business.

■ If, however, in the context of a particular contract a term has a special meaning within an industry, the contractor is permitted to introduce evidence to establish that meaning. The government is accountable, as drafter, for using a term that has a particular, specialized meaning to the anticipated reader. As the court wrote in *Hurst v. W.J. Lake Co.*, 141 Or. 306, 16 P.2d 627 (1932), "[o]ne cannot understand accurately the language of such sciences and trades without knowing the peculiar meaning attached to the words which they use. It is said that a court in construing the language of the parties must put itself into the shoes of the parties. That alone will not suffice; it must adopt their vernacular." *Hurst*, 16 P.2d at 629.

■ Trade practice and custom can thus be used to support a contention that a certain contract provision was legitimately interpreted in a way different than a layman's reading. However, the evidence would only be accepted because a contractor, in the industry targeted by the solicitation, made a colorable showing that it relied on a competing interpretation of words and not just on the fact that things are not customarily done in the manner called for by the contract. As a result, there would thus be present the ambiguity necessary to resort to trade custom and usage.

Defendant contends that this construction of *Gholson* runs afoul of the well-established line of cases with which the court began its analysis. Namely, it reads those decisions as barring evidence of custom and usage when the ordinary meaning of a term is unambiguous, regardless of a potential interpretive conflict with a special usage. Carefully examined, however, these cases do not stand for that proposition. Rather, each one held that a contractor cannot bind itself to specific work in the contract and then later attempt to avoid the contractual obligation by pointing to a conflicting trade custom which makes the step useless or impractical. In other words, defendant's attempt to exclude custom and trade usage would be correct if indeed the contract were unambiguous. Defendant's approach, however, ignores the fact that there can be more than one meaning of a term, and that specialized, or trade meanings take precedence over "lay" meanings.

The Government's argument against employing custom and usage is thus plainly too broad. Adopting its view would be inconsistent not only with the authorities considered above, but also with a number of other general principles of contract interpretation. For example, the Court of Claims in *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965), held that "the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." This is consistent with the seminal decision of the Supreme Court in *Nash v. Towne*, 72 U.S. (5 Wall.) 689, 18 L.Ed. 527 (1866), in which the Court provided guidelines for contract interpretation which remain useful today:

> Courts, in the construction of contracts, look to the language employed, the subject-matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed

them, and so to judge of the meaning of the words and of the correct application of the language to the things described. *Nash*, 72 U.S. (5 Wall.) at 699.

Similarly, in *Rice v. United States*, 192 Ct.Cl. 903, 908, 428 F.2d 1311, 1314 (1970), the court pointed out that in judging the import of the words of the contract, "the context and intention [of the contracting parties] are more meaningful than the dictionary definition." To put it differently, the court can "place itself 'into the shoes of a "reasonable and prudent" contractor' and decide how such a contractor would act in [plaintiff's] situation." *P.J. Maffei Bldg., Wrecking Corp. v. United States*, 732 F.2d 913, 917 (Fed. Cir.1984) (quoting *H.N. Bailey & Assoc. v. United States*, 196 Ct.Cl. 156, 163, 449 F.2d 387, 390 (1971)); *see also Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971); *Hol–Gar Mfg. Co.*, 169 Ct.Cl. at 390, 351 F.2d at 976 ("In construing a contract, the language of the instrument is given its ordinary and commonly accepted meaning unless it is shown that the parties intended otherwise.").

The issue has to be: What bargain did the parties strike? What was, or should have been, their contemporaneous mutual understanding as to the work to be done? The issue is not, at least in the present context, one of economic waste.

 With this guidance in mind, the issue thus becomes whether the specification in question is ambiguous. An ambiguous contract, in turn, requires that it is "susceptible of two different interpretations, each of which is found to be consistent with the contract's language." *Maintenance Eng'rs, Inc. v. United States*, 21 Cl.Ct. 553, 559 (1990) (citing *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968)). Or stated differently, "[a] contract is ambiguous if it sustains the interpretations advanced by both parties." *Avedon Corp. v. United States*, 15 Cl.Ct. 771, 776 (1988) (citing *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 627, 427 F.2d 1233, 1245 (1970)). However, any ambiguity that is solely the result of the party's unexpressed, subjective belief is insufficient to

bind the other contracting party. This unexpressed, subjective intent plays no role in interpreting a contract. *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975); *Firestone Tire & Rubber Co.*, 195 Ct.Cl. at 30, 444 F.2d at 551.

The contract provision in question here, subparagraph 19.7 of the specifications, is ambiguous in the sense that it is susceptible of two different interpretations, each of which is consistent with the contract's language. Although the dictionary definition of "metallic pipes" would embrace CISP, plaintiff has created an issue as to the possible existence of a specialized meaning in the industry in the context of a wrapping requirement for underground CISP. If an informed person reading the contract would reasonably assume that wrapping is not required because cleaning and wrapping underground CISP makes no sense, and if that assumption would not deprive the specification of all meaning, i.e., if there is a more limited sense in which the requirement is apparently intended to apply, then the court is faced with conflicting meanings, not nullification. Such is the present circumstance. Plaintiff's reading is supported by its evidence that authorized representatives of the agency had, on earlier occasions, interpreted the words as plaintiff advocates.

The court therefore rejects, as a matter of law, defendant's assertion that the ordinary or "layman's" meaning of the term "metallic pipe" is controlling. The determination of whether the requirement of wrapping CISP was consistent with the contract permits consideration of plaintiff's evidence of a special meaning in the trade. Plaintiff, however, has not moved for summary judgment. The issue of what the contract calls for is thus not yet squarely presented.

The defendant's motion for summary judgment is denied. The parties are ordered to file a joint status report on or before August 24, 1992 proposing cutoff dates for discovery and dispositive motions.